## Appeal of INSLEY MANUFACTURING CO. Docket No. 443.

1. The stockholders of a corporation, to secure additional capital, entered into a contract with one Dollings, pursuant to which the taxpayer corporation was organized with a capital stock of $750,000, divided into $500,000 of preferred and $250,000 of common stock, and, in consideration of the transfer to the taxpayer of the assets of the old corporation, there were issued to the stockholders, in proportion to their interests, $250,000 of the common and $165,000 of the preferred stock of the taxpayer. The contract provided that the preferred stock of the taxpayer be issued to one of the stockholders, as trustee; that $165,000 thereof be disposed of by Dollings for the benefit of the stockholders and that the remainder be sold by Dollings to net the taxpayer $80 per share; and that, of the $250,000 common stock, $50,000 be transferred to Dollings for his services. Assuming that all the provisions of the contract were carried out, *held:* the "interest or control" in the "trade or business" of the taxpayer remained in the stockholders of the old corporation to the extent of 50 per cent or more after the reorganization, within the meaning of section 331 of the Revenue Act of 1918, limiting the valuation, for invested capital purposes, of assets transferred in cases of reorganizations.

2. A taxpayer's claim of error appearing on the face of a revenue agent's report, which report is not clear upon the point at issue, will be rejected where the taxpayer fails to introduce any proof with reference thereto.

3. A right to special relief under section 328 of the Revenue Act of 1918, based upon the bare ground that the Commissioner at some time had made computations giving taxpayer the benefit of that section, will not be allowed by this Board upon that ground alone.

Submitted February 25, 1925; decided April 18, 1925.

*Jesse I. Miller, Esq.,* for the taxpayer.
*John D. Foley, Esq.,* for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

This is an appeal from a determination by the Commissioner of a deficiency in income and profits tax of the taxpayer for the years 1918 and 1919, in the amounts, respectively, of $10,676.22 and $14,762.21—a total of $25,438.43.

### FINDINGS OF FACT.

The taxpayer is a corporation, organized in September, 1917, under the laws of the State of Indiana, with its principal office in the City of Indianapolis, Ind.

During the year 1905, there was organized a company known prior to February 10, 1909, as the Insley Iron Works, the name of which company was, on the above date, changed to the Insley Manu-

facturing Co. Said corporation, at its original incorporation, issued $10,000 of capital stock, which capital stock was thereafter, and prior to September 17, 1917, increased from time to time until on the said date it had outstanding $88,600 of capital stock, divided into 886 shares, of which shares W. H. Insley owned 600; S. C. Wagner, 180; F. S. Pfeiffer, 66, and A. C. Rasmussen, 40.

On September 17, 1917, the balance sheet of the said Insley Manufacturing Co., hereinafter designated as the predecessor company, showed assets and liabilities as follows:

| Assets. | | Liabilities. | |
|---|---|---|---|
| Cash | $2, 619. 72 | Accounts Payable | $60, 631. 00 |
| Life Insurance | 660. 00 | Bills Payable | 4, 920. 44 |
| Notes Receivable | 17, 528. 80 | Current Appliance Co | 1, 663. 77 |
| Accounts Receivable | 52, 241. 54 | Capital Stock, Com | 88, 600. 00 |
| Merchandise Inventory | 50, 325. 89 | Capital Stock, Pfd | |
| Land | 15, 155. 00 | Resv. for Depreciation | |
| Patents and Good Will | | Resv. for Taxes | |
| Prepaid Insurance | | Surplus | 47, 056. 35 |
| Catalogue Supplies | | | |
| Organization Exp | | | |
| Buildings | 31, 290. 81 | | |
| Machinery and Equipment | 23, 744. 30 | | |
| Drawings and Templates | 9, 305. 50 | | |
| Total | 202, 871. 56 | Total | 202, 871. 56 |

Prior to September 17, 1917, the said predecessor company caused an appraisal to be made of its assets, which appraisal showed increases in the land, buildings, machinery and equipment, and drawings and templates accounts.

On September 17 the predecessor company transferred to the taxpayer in this appeal all of the property then held by the predecessor company at the valuations arrived at in the appraisal above mentioned, including also in the said transfer all the patents and good will of the predecessor company; prepaid insurance, and catalogue supplies, all of said assets being then taken and valued at a total of $506,765.92, in detail as follows:

| | |
|---|---|
| Cash | $2, 619. 72 |
| Life Insurance | 660. 00 |
| Notes Receivable | 17, 528. 80 |
| Accounts Receivable | 52, 241. 54 |
| Merchandise Inventory | 50, 325. 89 |
| Land | 17, 310. 00 |
| Patents and Good Will | 250, 000. 00 |
| Prepaid Insurance | 1, 761. 09 |
| Catalogue Supplies | 995. 75 |
| Organization Exp | 33, 000. 00 |
| Buildings | 37, 735. 83 |
| Machinery and Equipment | 31, 266. 62 |
| Drawings and Templates | 11, 320. 68 |
| Total | 506, 765. 92 |

In consideration of the aforesaid transfer of assets, the taxpayer issued its common and preferred stock, in the sums of $250,000 and $165,000, respectively, in the names of the then stockholders of the predecessor company, namely, Insley, Wagner, Pfeiffer, and Rasmussen, in the proportions, both as to common and preferred stock, which their respective holdings in the predecessor bore to the total stock

outstanding in the said company, said stock in the taxpayer company being issued under circumstances as set forth hereinafter in these findings.

Prior to the 17th of September, 1917, and on or about the 12th day of September in that year, the aforesaid Insley, Wagner, Pfeiffer, and Rasmussen entered into a certain contract with the R. L. Dollings Co., an Indiana corporation, with its principal office and place of business in the City of Indianapolis, the purpose of which contract was to secure to the business then carried on by the predecessor company, and to be taken over by the taxpayer, additional capital to be furnished by the said Dollings.

The contract so entered into provided, in substance, as follows:

1. That a corporation should be organized to take over the property and business of the predecessor company.

2. That the said company, when organized, should have a capital stock of $750,000, divided into 7,500 shares of $100 each, of which $500,000 should be 7 per cent cumulative preferred stock, and $250,000 common stock.

3. That—

Said preferred and common stock shall be entitled to such rights, privileges, preferences and voting powers, and be subject to such limitations, restrictions, and qualifications, as the parties hereto may determine under advice of counsel. And the usual protective, regulatory and supervisory provisions required by party of the second part (Dollings) in its financing shall be inserted in the Articles of Incorporation and in the by-laws of said new corporation.

4. That the board of directors of the new corporation should be composed of five members, Insley, Wagner, Pfeiffer, Rasmussen, and one R. C. Kaster, the representative of the said Dollings.

5. That there should be an executive committee of three of the five aforesaid directors, to consist of Insley, Wagner, and the representative of the said Dollings.

6. That so long as any part of the preferred stock of the taxpayer should remain outsanding, the said Dollings should be entitled to nominate and have elected at least one member of the board of directors, and should have the right to name the treasurer of the corporation.

7. That the consideration to be paid for the transfer of the property of the predecessor company should be the capital stock of the taxpayer in the sum of $165,000 preferred stock, and $250,000 common stock, issued to Insley, Wagner, Pfeiffer, and Rasmussen, as hereinbefore set forth, and that the shares of common stock to be issued to the said parties should be Insley, 1,754 shares; Wagner, 507 shares; Pfeiffer, 149 shares; and Rasmussen, 90 shares.

8. That the preferred stock in connection with the said transaction should be issued in the name of William H. Insley, Trustee, and that all of the said $165,000 preferred stock to be issued should be disposed of by Dollings so as to yield to Insley, Wagner, Pfeiffer, and Rasmussen a total sum of $132,000 in cash, and that the remaining unissued preferred stock of the taxpayer should be sold by Dollings to yield to the taxpayer not less than $80 per share on account of the said preferred stock.

9. That the preferred stock issued to the four parties above mentioned and the stock to be sold directly from the unissued stock of the corporation should, as to $330,000 thereof, be marketed con-

currently, so that out of the proceeds of sales of stock one-half should go to the four parties and one-half to the treasury of the corporation.

10. That of the common stock issued to the said Insley, $50,000 in par value should be transferred to Dollings for services rendered and to be rendered by Dollings.

11. To secure the efficient management of the corporation and to protect the holders of the preferred stock, it was further provided in the said contract that:

* * * it is well understood and agreed that provision is to be made through a suitable voting trust, or otherwise, as may be hereafter determined by the parties hereto under advice of counsel, whereby party of the second part, its successors and assigns, shall be able to control the management and direction of the business and affairs of said new corporation during the time any part of its preferred stock is issued and outstanding. And in the event a voting trust is decided upon all of the common stock of said new corporation, with the exception of the shares necessary to qualify the directors thereof, shall be deposited in such voting trust, the trustees of which shall be three in number, one of whom shall be the said Wm. H. Insley, another shall be the General Counsel for the time being of the party of the second part, and the third shall be agreed upon by the other two.

Thereafter, under date of September 17, 1917, Insley and his associates caused the taxpayer corporation to be incorporated, as hereinbefore set forth, and caused provisions to be included in its articles of incorporation and by-laws, carrying out the agreement theretofore entered into with Dollings, including:

(1) A guaranty fund on account of dividends on the preferred stock.

(2) That the preferred stock should have voting powers in the event of failure to pay dividends; failure to maintain or properly apply the preferred stock dividend guaranty theretofore provided for; failure to provide for a sinking fund for the redemption of preferred stock; pledging or otherwise encumbering the assets of the corporation except in the ordinary course of business to the prejudice of the preferred stockholders; declaring or paying dividends on the common stock, except under provisions safeguarding the preferred stockholders; neglecting or refusing to elect a representative of Dollings on the board of directors or to furnish Dollings with full information relative to the affairs of the company; failing or refusing to maintain insurance, or otherwise violating the provisions of the articles of incorporation.

12. It was further provided in the articles of incorporation that the taxpayer should not incur current indebtedness in excess of 25 per cent of the corporation's full current assets, except with the consent of the said Dollings, and that the salaries paid to Insley and his associates should not exceed certain specified sums per year without the consent of the representative of Dollings.

The Commissioner, in determining the deficiency in tax, as set forth in the deficiency letter above mentioned, disallowed as a part of invested capital $25,027.15 on account of tangible assets, and allowed as a part of invested capital $78,957.33 of the total of $250,-000 intangible assets appearing on the books of the taxpayer and theretofore acquired by it for common stock. The Commissioner also reduced invested capital in the sum of $14,000 on account of a dividend paid in January, 1919, and, although he had theretofore

determined the tax under section 328 of the Revenue Act of 1918, failed in asserting the deficiency in the said deficiency letter to give effect to such determination. From these alleged errors, the taxpayer brought its appeal. The Commissioner, in his answer to the petition of the taxpayer, in addition to denying that he had erred in any respect with reference to the determination before the Board, by an amendment to his answer to the petition, asserted as an affirmative defense that the taxpayer was the result of a reorganization in which an interest or control of 50 per cent or more had remained in the same persons, and that, therefore, he had been in error in allowing the taxpayer any increased value with respect to the assets transferred from the predecessor to the taxpayer corporation, including any amount for good will in the taxpayer corporation.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final decision will be settled on consent or on ten days' notice, in accordance with Rule 50.

### OPINION.

JAMES: The taxpayer alleges as errors of the Commissioner upon which he predicates his appeal the following:

1. Failure of the Commissioner to allow as invested capital the amounts of $25,027.15, increased value of tangible assets, and the difference between $78,957.33 and $119,000 as the value of intangible assets.

2. An erroneous duplication of $14,000 on account of a dividend paid in January, 1919, from a reserve for dividends alleged by the taxpayer to have been deducted from surplus as of the close of the preceding year.

3. Failure of the Commissioner to compute the tax under the provisions of section 328 of the Revenue Act of 1918.

As an affirmative defense, the Commissioner claims that the taxpayer is subject to the provisions of section 331 of the Revenue Act of 1918, and that not only should the alleged additions to invested capital be disallowed in the proper computation of the tax, but that there should be deducted in addition the sum already allowed of $78,957.33.

As the Commissioner's defense, if successful, disposes of the entire case of the taxpayer upon the questions of invested capital, this defense will first be considered.

Section 331 of the Revenue Act of 1918, so far as material, provides as follows:

In the case of the reorganization, consolidation, or change of ownership of a trade or business, or change of ownership of property, after March 3, 1917, if an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them, then no asset transferred or received from the previous owner shall, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under this title in computing the invested capital of such previous owner if such asset had not been so transferred or received: * * *

We are to inquire whether, under the facts stated, "an interest or control" in the business or property of the taxpayer remained, after

its incorporation and the transfer of its property from the predecessor company, in its former stockholders, Insley, Wagner, Pfeiffer, and Rasmussen.

The facts, so far as they are before the Board, are gathered entirely from the contract between Dollings and the above-named parties and the articles of incorporation and by-laws of the taxpayer. It does not appear whether these agreements were in all respects carried out. For the purpose of this determination, it will be assumed that they were.

It appears that, at the organization of the taxpayer corporation, the property of the predecessor corporation was transferred to the taxpayer in consideration of $250,000 common stock and $165,000 preferred stock. It further appears that the common stock was all issued to Insley and his associates in the first instance, and that the preferred stock was likewise so issued.

On the basis of the first formal step taken in the organization of the taxpayer, it is clear that 100 per cent interest and control both resided at the instant of the incorporation of the taxpayer, and the transfer to it of the property in question, in Insley and his associates.

We might place our decision entirely on the ground that section 331 does not provide for any period of time during which the interest or control mentioned in that section shall remain in the parties from or through whom the property of the taxpayer is acquired. Whether the statute is susceptible of such a narrow construction, we do not now decide.

It is apparent, however, under the Dollings contract, that much more than a mere reincorporation was involved in this case. The taxpayer was desirous of securing additional capital in the business. It secured the additional capital from Dollings, and Dollings, as an investment banker, imposed terms adequate and necessary to the safeguarding of the additional capital so advanced. Dollings also imposed a price for the service so rendered, namely, $50,000 par value of the common stock of the taxpayer.

Immediately upon the organization of the taxpayer, we find, therefore, that its stock is owned by four individuals who are themselves under obligation to deliver to Dollings $50,000 out of the $250,000 common stock. The contract with respect to the preferred stock differs somewhat from the treatment of that stock upon the books of the company, and we have, therefore, made no definite finding of fact with reference thereto. It is provided in subparagraph four of paragraph third of the Dollings contract as follows:

Said preferred stock consideration, or the cash proceeds thereof, shall be distributed and paid to vendors as the owners of all of the issued and outstanding capital stock of the Company, equally and pro rata according to their respective shares. The outstanding capital stock of the Company amounts to $88,600.00, divided into shares of par value of $100.00 each, and is presently owned and held as follows: W. H. Insley 600 shares; C. S. Wagner 180 shares; F. L. Pfeiffer 66 shares; and A. C. Rasmussen 40 shares. So that said preferred stock, when issued, will be owned by vendors in the following proportions, to-wit: W. H. Insley $\frac{600}{886}$ parts; C. S. Wagner $\frac{180}{886}$ parts: F. L. Pfeiffer $\frac{66}{886}$ parts; and A. C. Rasmussen $\frac{40}{886}$ parts. And the cash proceeds of said preferred stock shall belong to vendors in like proportions.

It is further provided in the first subparagraph of paragraph fourth as follows:

Party of the second part agrees to dispose of all of said $165,000.00 of preferred stock so to be issued to vendors by said new corporation to produce for them net the sum of $132,000.00 in cash, and also all of the unissued preferred stock of the said new corporation, amounting to $335,000.00 par value, or so much thereof as may be needed by said new corporation for its corporate purposes, and to net said new corporation at the rate of $80.00 for each $100.00 share.

It appears from the opening balance sheet of the taxpayer, submitted in evidence, that the entire preferred stock of $165,000 above mentioned was issued and entered on the liability side. On the assets side, however, the difference between the amount of cash to be received by Insley and his associates and the par value ($165,000) of the stock issued, namely, $33,000, appears to have been entered as "organization expense."

Thus the second step discloses the taxpayer in the position of being owned as to 80 per cent of the common stock by Insley and his associates, and as to all of the preferred stock by the same group, subject to an agreement on the part. of Dollings to sell their preferred stock.

Thereafter, the preferred stock was delivered to a trustee for sale, and apparently it was sold and the proceeds of sale delivered to Insley and his associates. It further appears that some portion, at least, of the remaining preferred stock was sold from time to time, since the balance sheet of the taxpayer as of December 31, 1920, shows preferred stock outstanding in the sum of $268,000.

It is apparent from the foregoing that "the interest" in the "trade or business or property" of the taxpayer remained in Insley and his associates to the extent of 50 per cent or more after the reorganization. They owned all of the common stock, and, subject to an agreement on the part of Dollings to sell, they owned all of the preferred stock.

Inasmuch as the above section 331 is clearly to be construed in the disjunctive, it is unnecessary to discuss in detail whether Insley and his associates remained in control of the property or business subsequent to the reorganization. Suffice it to say that we believe they did, and that the restrictions on management contained in the Dollings contract and in the articles of incorporation and by-laws of the taxpayer were nothing more than, as stated in the Dollings contract, "the usual protective, regulatory and supervisory provisions required by party of the second part (Dollings) in its financing." The restrictions upon the corporate management were only such as prudent investment bankers impose in connection with the financing or refinancing of corporations, and were no more stringent than those usual in connection with bond issues. The preferred stock, so called, provided in the taxpayer company, has many of the characteristics, including provisions for retirement, which ordinarily accompany debenture bonds. The preferred stock was without voting power, except in default of payment of dividends or violation of the terms of the Dollings agreement or the articles of incorporation or by-laws of the corporation. If Insley and his associates acted with ordinary prudence, foresight and honesty, they would remain, and, for all the records show, did remain in as complete control of the taxpayer as they were in control of the predecessor business. The restriction upon their own salaries, whereby they were limited

to $12,000 for Insley, $5,600 for Wagner, $3,300 for Pfeiffer, and $3,000 for Rasmussen, except by agreement with Dollings's representative, does not appear as such a serious restriction of their control when reference is made to the fact that the salaries of the four for the years 1916 to 1920, inclusive, were as follows:

| | W. H. Insley | C. S. Wagner | F. L. Pfeiffer | A. C. Rasmussen |
|---|---|---|---|---|
| 1916 | $3,540.00 | $3,000.00 | $1,885.00 | $1,755.00 |
| 1917 | 7,640.71 | 4,192.53 | 2,762.52 | 2,509.93 |
| 1918 | 12,000.00 | 6,175.00 | 3,374.93 | 3,150.29 |
| 1919 | 13,200.00 | 8,750.00 | 3,960.00 | 3,960.00 |
| 1920 | 15,000.00 | 10,000.00 | 5,000.00 | 5,000.00 |

The second point is that the Commissioner erred by a double deduction of $14,000 on account of a dividend paid in January, 1919, out of a reserve for dividends set up at the close of the preceding year.

The revenue agent's report upon this point is not as clear as is ordinarily the case. The revenue agent submits a reconciliation of surplus, from which he apparently made his adjustments with respect to invested capital. From the reconciliation of surplus, it would appear that the cash dividend on account of preferred stock is set up as of January 1, and not as of December 31, and his computation of invested capital does not show upon its face more than one adjustment on account of the item of $14,000 above mentioned. The taxpayer, having relied entirely upon what he alleged to be a clear error upon the face of the revenue agent's report, and not having introduced any proof with reference thereto, we are unable to determine that the alleged error occurred, nor that any adjustment on account thereof should be made.

On the third point, namely, relief under the provisions of section 328, we have recently decided in the *Appeal of Morris & Co., Inc.*, 1 B. T. A. 704, that the mere fact that the taxpayer is subject to the restrictive provisions of section 331 does not warrant the Board in finding such an abnormality as to require the assessment under the provisions of section 328. The record here before us is silent as to any other possible conditions of abnormality. The taxpayer simply alleges that the Commissioner has at some time computed its tax under section 328, but has failed to give it the benefit of that computation in the deficiency letter from which the appeal is taken to this Board. We decided in the *Appeal of Chalmers Publishing Co.*, 1 B. T. A. 629, that a taxpayer may not claim before this Board the benefits of section 328 upon the bare ground that at some time or other the Commissioner has made computations giving it that benefit if the computation under section 328 is omitted in the determination of the deficiency from which it appeals. It follows from the foregoing that the Commissioner's determination must be affirmed with reference to all the points of error alleged by the taxpayer, and that, in addition, the invested capital of the taxpayer must be decreased by the sum of $78,957.33, and the tax re-computed accordingly under the provisions of section 301 of the Revenue Act of 1918.