## APPEAL OF BLUM'S, INCORPORATED.

Docket No. 2523. Promulgated July 26, 1927.

1. A person who regularly sells or otherwise disposes of personal property on the installment plan is entitled, under the provisions of section 1208 of the Revenue Act of 1926, in computing income under the Revenue Acts of 1916, 1917, 1918, 1921, and 1924, to return the income from installment sales by the use of the installment method as prescribed by subdivision (d) of section 212 of the Revenue Act of 1926.

2. A taxpayer who changes from the straight accrual method to the installment sales method of returning income must return as income of the year in which the change is made, and of all subsequent years, a proper proportion of all installment payments, actually received in those years, relating to sales effected in years prior to the change in method, notwithstanding that the entire profits from the sales to which such payments relate were, under the method of returning income then employed, returned and taxed as income of the years in which such sales were effected. In this respect, article 42 of the Commissioner's Regulations 45, promulgated April 17, 1919; the same article of the Commissioner's Regulations 45, promulgated December 29, 1919, and the same article of the Commissioner's Regulations 69, are approved as properly interpreting the statutes.

3. The proper method of computing the annual percentage of profit and the proportion of the installment payments, relating to the sales of any taxable year, to be returned as income, determined.

4. A taxpayer employing the accrual method of accounting but returning income from installment sales on the installment sales method, is entitled to deduct from the income of any taxable year all of the expenses, allowances, and losses enumerated in sections 214 and 234 of the Revenue Act of 1918 which were paid or incurred, or paid or accrued, within the taxable year.

5. Installment payments received and refunded by petitioner in the same year should be excluded from the total installment payments received before computing the proportion thereof to be returned as income.

6. During 1917 the petitioner followed the accrual method of keeping its books of account and rendering its income-tax return. Certain installment accounts, representing sales effected in that year, the entire profits of which were returned and taxed as income of 1917, were ascertained to be worthless and charged off in 1918, 1919, and 1920, after petitioner changed to the installment method of returning income. Petitioner did not repossess the merchandise from the purchasers. *Held*, that petitioner may deduct as bad debts, in 1918, 1919, and 1920, only such portion of the 1917 accounts ascertained to be worthless and charged off in those years as represents the unrecovered cost of the merchandise.

7. Proper method of accounting for losses sustained through damage and use to repossessed merchandise, for the purpose of computing net income, determined.

8. Additional salaries of $20,000, paid to petitioner's executive officers for 1919, were agreed upon by the directors before the end of the taxable year 1919, though not formally authorized by resolution until the following years, and, under the circumstances, such additional salaries are a proper deduction from income for 1919.

9. At the beginning of each of the taxable years on appeal, there stood on the books of account installment accounts receivable representing sales effected in 1917, when petitioner was following the straight accrual method of accounting. *Held*, that petitioner may not include in invested capital of the years on appeal, as earned surplus, the profits included in said 1917 installment accounts receivable outstanding at the beginning of each year.

10. The Commissioner in the deficiency notice mailed to the petitioner determined an overassessment for the year 1918 and deficiencies for the years 1919 and 1920. Subsequent to the filing of the petition with the Board by the taxpayer, asking a redetermination of the deficiencies for 1919 and 1920, the Commissioner by amended answer affirmatively claimed a deficiency for 1918 and increased deficiencies for 1919 and 1920. *Held*, that the assessment of any tax for the calendar year 1918 is barred by the statute of limitation; *held, further*, that the Commissioner was within his rights in claiming increased deficiencies for 1919 and 1920.

*J. Wallace Bryan*, Esq., *H. C. Bangs*, Esq., *R. S. Doyle*, Esq., and *R. Kemp Slaughter*, Esq., for the petitioner.

*A. W. Gregg*, Esq., and *G. E. Adams*, Esq., for the Commissioner.

This proceeding is for the redetermination of deficiencies in the amounts of $5,306.23 and $19,318.83, for 1919 and 1920, respectively. The deficiency notice also shows an overassessment of $21,429.04 for 1918. The issues are: (1) Overstatement of the income from installment sales; (2) disallowance in part of deductions for refunds made to purchasers on cancellation of installment sales; (3) understatement of deductions for bad debts; (4) disallowance of deductions for discounts and allowances, freight, and alterations; (5) disallowance of losses sustained through damage to merchandise sold on the installment plan and subsequently repossessed; (6) disallowance of loss sustained in 1920 on account of decline in value of merchandise inventory; (7) disallowance in part of deduction for officers' salaries for 1919; (8) whether petitioner suffered a net loss in 1919 which may be offset against the income for 1920; and (9) the amount of the net income or the net loss, as the case may be, which petitioner realized or sustained in 1920. On October 16, 1925, the Commissioner, upon motion duly made, filed an amended answer, in which, in lieu of the overassessment for 1918 and the deficiencies for 1919 and 1920 shown in the original deficiency notice, mailed January 15, 1925, deficiencies are asserted for the three years in the amounts of $7,143.28 for 1918, $26,380.74 for 1919, and $46,216.87 for 1920. The petitioner filed a motion, in the nature of a demurrer, excepting to the sufficiency of the amended answer in law and in fact, and moving that it be dismissed, for the reason that it raised issues as to the year 1918 for which the Commissioner had theretofore, in the deficiency notice appealed from, determined an overassessment, and also claimed increased deficiencies for the years 1919 and 1920.

The proceeding was taken under submission upon the issues raised in the original petition and answer, the amended answer of the Commissioner and petitioner's replication thereto. The parties filed a stipulation admitting the correctness of all the base figures and mathematical computations contained in the Commissioner's amended answer, the petitioner expressly denying, however, the validity of the Commissioner's computations and the results thereof. The parties further stipulated certain material facts in addition to the testimony offered, from all of which the Board makes the following:

### FINDINGS OF FACT.

Petitioner is a Delaware corporation with its principal office and place of business at Baltimore, Md., where it is, and was during the

years in controversy, engaged in the sale of furniture, general merchandise, household utensils, ladies' and men's ready-to-wear clothing, pianos, and phonographs, for cash and on the installment plan.

For the years 1917 to 1920, inclusive, the books of accounts show the following sales:

| | 1917 | 1918 | 1919 | 1920 |
|---|---|---|---|---|
| Cash sales | | $23,351.33 | $29,999.03 | $23,676.46 |
| Installment sales | | 474,334.40 | 708,914.18 | 1,058,527.96 |
| Gross sales | | 497,685.63 | 738,913.21 | 1,082,204.42 |
| Less returns | | 68,839.33 | 92,937.94 | 129,678.96 |
| Net sales | $295,361.09 | 428,846.30 | 645,975.27 | 952,525.46 |

The cash sales are usually of the "leader" or "puller" type, that is, they are widely advertised, and are made at attractive prices, usually at a small margin above cost, in order to influence people to come into the store.

In the case of sales on the installment plan, purchasers are required to execute a conditional sale agreement which provides, among other things, that title to the property described therein shall remain in the vendor until payment therefor has been made in full; that in the event of default in payments the vendor shall forthwith become entitled to take immediate possession of the property, with or without legal process, and shall retain all sums paid as compensation for the use of the property and as liquidated damages for wear and tear upon such property; and that upon retaking possession of the property the vendor may, at its option, sell the same, and hold the purchaser liable for any deficiency arising on account of breach of the agreement together with the expense of retaking and selling the property.

The initial payments required from purchasers are usually less than 10 per cent of the contract price; and, frequently, if the purchaser has established a reputable credit standing, through prior dealings with petitioner, no initial payment is required. The balance of the contract price is paid in weekly installments, sometimes the deferred payments being extended over a period of two to three years.

The purchasers of merchandise on the installment plan are principally of the wage-earning class. About 60 per cent of them are colored. Their ability to meet the deferred payments depends almost entirely upon their being able to earn wages. Sickness, loss of employment, or other causes frequently interrupt the payments.

During 1918, 1919, and the first nine months of 1920, business conditions in and around the vicinity of Baltimore were most favorable. Wages were at a high level and there was little unemployment.

Circumstances forebode a continuation of favorable business conditions well into the future. Commitments were made by petitioner's customers according to their then earning power. The gross sales for 1918, 1919, and 1920, increased approximately 67 per cent, 48 per cent, and 46 per cent, over the gross sales for 1917, 1918, and 1919, respectively. During the last three months of 1920, there were noticeable indications of a business depression which reached its climax during 1921 and 1922. A large number of petitioner's wage-earning customers were thrown out of employment and were unable to meet their deferred payments. To some considerable number of them the petitioner extended additional time for settlement of their obligations. Others defaulted in their payments and moved to parts unknown. Of the total installment sales of $708,914.18 for 1919, and $1,058,527.96 for 1920, there remained uncollected on January 1, 1925, the sums of $124,910.67 and $255,116.26, respectively. On July 17, 1924, petitioner had on its books of account 26,255 accounts with customers, among which there were 9,852 accounts, with an aggregate unpaid balance of $228,829.99, which showed no payments made since January 1 of the same year.

It is the petitioner's policy to cooperate with purchasers on the installment plan, in cases where unfortunate circumstances arise, by extending additional time, beyond that provided in the sale agreement, within which such purchasers may settle their accounts. It is also its policy to repossess its merchandise, when obtainable, in every case where the purchaser manifests an intention not to meet the deferred payments.

It has been the petitioner's experience that the repossession of merchandise under defaulted installment contracts is a source of substantial loss, even when the payments made before default are taken into account. The condition of repossessed merchandise varies according to its character, usage to which subjected while in possession of the purchaser, and the period of use. As a general rule, the condition of this merchandise is such that it must be sold at a substantial reduction in price, even after reconditioning, and the petitioner fails to recover the original cost. Some repossessed merchandise, such as bedding, wearing apparel, and similar articles, can not be resold and is destroyed. But whatever the character or condition of the merchandise, the petitioner exercises its right of repossession, if possible, for the moral effect such repossession might have.

Only a very small percentage of the deferred payments are made at petitioner's place of business. The collection of the unpaid installments requires the maintenance of a highly organized collection department and unremitting and intensive collection efforts.

The territory in which petitioner operates is divided into approximately 30 collection districts, each of which is assigned to one or more collectors. The petitioner also maintains a separate department for tracing purchasers who have moved, taking the merchandise with them, and are in default in their payments.

An individual record card is kept for each purchaser on the installment plan, showing the contract price, the dates and amounts of initial and subsequent payments, and, in case of default in payment and of repossession, the estimated value of the repossessed merchandise.

In the case of default in payments and repossession of the merchandise, the accounting practice is to credit the purchaser's account and debit "return sales" account with the unpaid balance of the contract price. The record is not clear as to the accounting procedure followed in respect of the repossessed merchandise.

The cost of all goods sold, in the years 1917 to 1920, inclusive, is as follows:

| | | | |
|---|---|---|---|
| 1917 | $149,448.48 | 1919 | $336,122.82 |
| 1918 | 202,912.95 | 1920 | 457,579.33 |

The cost of goods sold for cash was not kept separate, on the books of account, from the cost of goods sold on the installment plan, and the accounting records do not contain sufficient information upon which to base an accurate segregation of the costs of the two classes of sales.

The installment payments received during each of the years in controversy, classified according to the year of the sales to which they relate, are as follows:

| Year of sale | Installment payments received | | |
|---|---|---|---|
| | 1918 | 1919 | 1920 |
| 1917 | $118,188.73 | $16,953.34 | $4,057.81 |
| 1918 | 216,143.95 | 130,985.18 | 38,448.74 |
| 1919 | | 310,554.98 | 207,568.75 |
| 1920 | | | 431,798.59 |
| Total | 334,332.68 | 458,493.50 | 681,873.89 |

Included in the installment payments received in 1919 and 1920 are certain amounts which relate to sales which were canceled in those years because of default in payment by purchasers, said amounts, classified according to the year of the sales to which they relate, being as follows:

| Year of sale | Received | |
|---|---|---|
| | 1919 | 1920 |
| 1918 | $1,008.00 | $264.50 |
| 1919 | 2,586.85 | 649.60 |
| 1920 | | 2,817.98 |
| Total | 3,594.85 | 3,732.08 |

In 1919 and 1920, petitioner refunded installment payments in the total amounts of $1,942.31 and $3,273.65, respectively. These payments were made by purchasers in the same year in which refunded, and related to sales made and canceled in the same year.

During the years under consideration, accounts of purchasers on the installment plan were ascertained to be worthless and charged off in amounts as follows:

| Year of sale | Worthless accounts charged off | | |
|---|---|---|---|
| | 1918 | 1919 | 1920 |
| 1917 | $19,205.10 | $9,744.44 | $3,789.64 |
| 1918 | | 10,623.22 | 2,991.43 |
| 1919 | | 4,697.05 | 5,259.56 |
| 1920 | | | 2,379.02 |
| Total | 19,205.10 | 25,064.71 | 14,419.65 |

In 1918, 1919, and 1920, petitioner expended the sums of $1,785.32, $4,590.08, and $6,599.12, respectively, for inbound freight and hauling of merchandise. In 1919 and 1920, it expended the sums of $2,945 and $3,228.32, respectively, for alterations of merchandise sold.

The value of the merchandise inventory, at the close of 1920, is, on the basis of cost, $89,684.22, and on the basis of cost or market, whichever is lower, $64,025.73.

The income from all other sources than sales, realized and returnable for income-tax purposes, is as follows:

| Items | 1918 | 1919 | 1920 |
|---|---|---|---|
| Discounts earned | $4,806.01 | $7,740.96 | $10,249.72 |
| Over and short | 16.10 | | |
| Rents | 52.92 | | |
| Total | 4,875.03 | 7,740.96 | 10,249.72 |

The allowable deductions from gross income, for the years 1917 to 1920, inclusive, exclusive of bad debts, refunds to purchasers, expenses contained in the cost of goods sold, and an item of $20,000

for additional officers' salaries for 1919 which the Commissioner disallowed, are as follows:

1917 _____ $92, 118. 19 | 1919_____ $178, 730. 89
1918 _____ 132, 086. 27 | 1920 _____ 261, 559. 90

The straight accrual method was employed in keeping petitioner's books of account, all installment sales being considered as completed transactions of the years in which they were made. For all years prior to 1918, the returns were rendered in accordance with the books of account. The original returns which the petitioner filed for the years in question, purported to show the income by the use of the straight accrual method of accounting with respect to sales completed during the taxable years, and by the use of the installment method, as set forth in article 42 of Commissioner's Regulations 45, with respect to all other sales. Subsequently petitioner filed amended returns purporting to show its entire income on the installment sales method of accounting. The Commissioner, though conceding petitioner's right to return its income from installment sales on the installment method, held that the petitioner's computations of income were erroneous in principle and that the net income shown in the amended returns was not its true net income. The Commissioner redetermined the income for 1919 in the following manner:

|  | Department A | | Department B | | Department D | |
|---|---|---|---|---|---|---|
| Cash sales (net)_____ |  | $3, 211. 92 |  | $491. 98 |  | $3, 600. 88 |
| Installment sales (net)_____ |  | 28, 292. 00 |  | 27, 786. 48 |  | 87, 920. 72 |
| Total net sales_____ |  | 31, 503. 92 |  | 28, 278. 46 |  | 91, 521. 60 |
| Cost of goods sold: |  |  |  |  |  |  |
| Opening inventory_____ | $4, 948. 82 |  | $1, 072. 40 |  | $22, 036. 81 |  |
| Purchases_____ | 14, 221. 66 |  | 23, 178. 58 |  | 29, 249. 64 |  |
| Freight and hauling_____ | 210. 68 |  | 207. 01 |  | 655. 00 |  |
| Cost of alterations_____ | _____ |  | _____ |  | 1, 472. 50 |  |
| Total_____ | 19, 381. 16 |  | 24, 457. 99 |  | 53, 413. 95 |  |
| Closing inventory_____ | 4, 102. 38 |  | 9, 109. 28 |  | 14, 708. 25 |  |
|  |  | 15, 278. 78 |  | 15, 348. 71 |  | 38, 705. 70 |
| Gross profit_____ |  | 16, 225. 14 |  | 12, 929. 75 |  | 52, 815. 90 |
| Percentage of gross profit_ |  | 51. 50 |  | 45. 72 |  | 57. 70 |

|  | Departments E and F | | Department H | | Total | |
|---|---|---|---|---|---|---|
| Cash sales (net) _____ |  | $10, 905. 61 |  | $11, 788. 64 |  | $29, 999. 03 |
| Installment sales (net)_____ |  | 204, 890. 63 |  | 267, 086. 64 |  | 615, 976. 24 |
| Total net sales_____ |  | 215, 796. 24 |  | 278, 875. 05 |  | 645, 975. 27 |
| Cost of goods sold: |  |  |  |  |  |  |
| Opening inventory_____ | $19, 189. 13 |  | $16, 301. 00 |  | $63, 548. 16 |  |
| Purchases_____ | 129, 681. 25 |  | 149, 227. 29 |  | 345, 558. 42 |  |
| Freight and hauling_____ | 1, 780. 05 |  | 1, 737. 34 |  | 4, 590. 08 |  |
| Cost of alterations_____ | 1, 472. 50 |  | _____ |  | 2, 945. 00 |  |
| Total_____ | 152, 122. 93 |  | 167, 265. 63 |  | 416, 641. 66 |  |
| Closing inventory_____ | 27, 993. 89 |  | 24, 605. 04 |  | 80, 518. 84 |  |
|  |  | 124, 129. 04 |  | 142, 660. 59 |  | 336, 122. 82 |
| Gross profit_____ |  | 91, 667. 20 |  | 136, 214. 46 |  | 309, 852. 45 |
| Percentage of gross profit_ |  | 42. 46 |  | 48. 84 |  | 47. 96 |

| Year of sale | Department A | | | Department B | | |
|---|---|---|---|---|---|---|
| | Collections in 1919 | Percentage of gross profit applicable | Amount returnable as income for 1919 | Collections in 1919 | Percentage of gross profit applicable | Amount returnable as income for 1919 |
| 1917 | $653.30 | | | $1,384.44 | | |
| 1918 | 6,934.37 | 54.35 | $3,768.83 | 9,987.85 | 57.50 | $5,743.01 |
| 1919 | 15,426.16 | 51.50 | 7,944.47 | 6,773.04 | 45.72 | 3,096.63 |
| Total | 23,013.83 | | 11,713.30 | 18,145.33 | | 8,839.64 |

| Year of sale | Department D | | | Departments E and F | | |
|---|---|---|---|---|---|---|
| 1917 | $1,415.94 | | | $3,657.43 | | |
| 1918 | 16,950.84 | 62.00 | $10,509.52 | 47,053.01 | 51.15 | $24,067.61 |
| 1919 | 51,315.46 | 57.70 | 29,609.02 | 129,346.81 | 42.46 | 54,920.66 |
| Total | 69,682.24 | | 40,118.54 | 180,057.25 | | 78,988.27 |

| Year of sale | Department H | | | Total | | |
|---|---|---|---|---|---|---|
| 1917 | $9,842.23 | | | $16,953.34 | | |
| 1918 | 49,051.11 | 49.36 | $24,211.53 | 129,977.18 | | $68,300.50 |
| 1919 | 135,106.69 | 48.84 | 65,986.11 | 337,967.16 | | 161,556.89 |
| Total | 194,000.03 | | 90,197.64 | 484,897.68 | | 229,857.39 |

The collections as listed above include the proceeds from cash sales in 1919.

The collections as listed above do not include certain installment payments totaling $3,594.85 actually received in 1919 but relating to sales canceled in that year because of default in payments by purchasers. These items were handled by the Commissioner in the following manner:

| Year of sale | Department A | | | Department B | | |
|---|---|---|---|---|---|---|
| | Collections in 1919 | Percentage of gross profit applicable | Amount returnable as income for 1919 | Collections in 1919 | Percentage of gross profit applicable | Amount returnable as income for 1919 |
| 1918 | $143.00 | 45.65 | $65.28 | $541.00 | 42.50 | $229.50 |
| 1919 | 548.86 | 48.50 | 266.20 | 696.00 | 54.28 | 377.79 |
| Total | 691.86 | | 331.48 | 1,237.00 | | 607.29 |

| Year of sale | Department D | | | Departments E and F | | |
|---|---|---|---|---|---|---|
| 1918 | $82.75 | 38.00 | $31.45 | $112.60 | 48.85 | $55.00 |
| 1919 | 147.00 | 42.30 | 62.18 | 356.18 | 57.54 | 204.95 |
| Total | 229.75 | | 93.63 | 468.78 | | 259.95 |

| Year of sale | Department H | | | Total | | |
|---|---|---|---|---|---|---|
| 1918 | $128.55 | 50.64 | $65.10 | $1,008.00 | | $446.33 |
| 1919 | 838.81 | 51.16 | 429.14 | 2,586.85 | | 1,340.26 |
| Total | 967.36 | | 494.24 | 3,594.85 | | 1,786.59 |

The percentages used above are complementary to the percentages of gross profit applicable to the two years.

### COMPUTATION OF NET INCOME

| | | |
|---|---:|---:|
| Amount returnable as income from collections on sales contracts in force during the year | | $229, 857. 39 |
| Amount returnable as income from collections on sales contracts canceled during the year | | 1, 786. 59 |
| Discounts earned | | 7. 740. 96 |
| Total | | 239, 384. 94 |
| Less: Nontaxable Liberty bond interest | | 562. 98 |
| Gross income | | 238, 821. 96 |

Deductions:

| | | | |
|---|---:|---:|---:|
| Total ordinary and necessary expenses | $201, 902. 56 | | |
| Additional depreciation | 1, 051. 73 | | |
| Refunds to purchasers (47.96% of $1,942.31) | 930. 53 | | |
| Bad debts | 30, 201. 14 | | |
| | 234, 085. 96 | | |

Less disallowance and changes:

| | | | |
|---|---:|---:|---:|
| Alterations included in cost of goods sold | $2, 945. 00 | | |
| Donations | 1, 263. 05 | | |
| Unallowable taxes | 15. 42 | | |
| Capital expenditures | 1, 505. 97 | | |
| Excessive officers' salaries | 20, 000. 00 | 25, 729. 44 | 208, 356. 52 |
| Net income | | | 30, 465. 44 |

Precisely the same methods and procedure were followed by the Commissioner in his redetermination of a net income of $84,418.53 for 1920.

In the amended answer, the Commissioner sets forth detailed computations showing the net income and deficiencies, for the years in controversy, in amounts as follows:

| Year | Net income | Deficiency |
|---|---:|---:|
| 1918 | $51, 750. 83 | $7, 143. 28 |
| 1919 | 79, 320. 49 | 26, 380. 74 |
| 1920 | 147, 042. 71 | 46, 216. 87 |

The same basic figures, which the parties have stipulated to be correct, have been used in the computation in the amended answer as in the computations in the deficiency notice. The widely different results obtained by the use of the same basic figures is due to the fact that the methods of computing the income in the amended answer differ materially, in several respects, from the methods used in computing the net income shown in the deficiency notice. Since the same methods have been employed in the Commissioner's amended

answer for computing the net income for all three years, the computations for the year 1919, only, are given below:

### COMPUTATION OF GROSS PROFIT

| | | | | |
|---|---|---|---|---|
| Total net sales | | | | $645,975.27 |
| Cost of goods sold | | | $336,122.82 | |
| Total expense deductions exclusive of bad debts and refunds to purchasers | | $177,679.16 | | |
| Less collection expenses as follows: | | | | |
| 10% of collections on 1917 sales | $1,695.33 | | | |
| 10% of collections on 1918 sales | 12,997.72 | | | |
| 10% of collections on 1919 sales | 33,796.72 | 48,489.77 | | |
| Net operating expenses | | 129,189.39 | | |
| Additional depreciation | | 1,051.73 | 130,241.12 | 466,363.94 |
| Gross profit | | | | 179,611.33 |
| Percentage of gross profit | | | | 27.804 |

### COMPUTATION OF NET INCOME

| | | | |
|---|---|---|---|
| Realized profits: | | | |
| Collections 1917 accounts, 25.786% of $16,953.34 | | | $4,371.59 |
| Collections 1918 accounts, 29.679% of 129,977.18 | | | 38,575.93 |
| Collections 1919 accounts, 27.804% of 337,967.16 | | | 93,968.39 |
| Income from sales contracts canceled during the year | | | 1,786.59 |
| Discounts earned | | | 7,740.96 |
| Gross income | | | 146,443.46 |
| Less: | | | |
| Collection expenses as follows: | | | |
| 1917 accounts, 10% of $16,953.34 | | $1,695.33 | |
| 1918 accounts, 10% of 129,977.18 | | 12,997.72 | |
| 1919 accounts, 10% of 337,967.16 | | 33,796.72 | |
| Bad debts: | | | |
| 1917 accounts, 74.214% of $9,744.44 | | 7,231.73 | |
| 1918 accounts, 70.321% of 10,623.22 | | 7,470.35 | |
| 1919 accounts, 72.196% of 4,697.05 | | 3,391.08 | |
| Refund of installment payments: | | | |
| 1919 accounts, 27.804% of $1,942.31 | | 540.04 | |
| | | | 67,122.97 |
| Net taxable income | | | 79,320.49 |

The gross profits for 1917 and 1918, and the percentages of gross profit applied to the collections on 1917 and 1918 accounts for the purpose of determining the realized profits, were computed in the same manner as for the year 1919. The percentages applied to 1917, 1918, and 1919 bad accounts, for the purpose of determining

the deduction for bad debts, are complementary to the percentages of gross profit for those years.

In computing the income for 1918, in the amended answer, the Commissioner did not take into consideration the receipts from cash sales made in that year; consequently, the net income shown in the amended answer for 1918 does not include any profits realized from cash sales of that year.

In the deficiency notice, the Commissioner included in invested capital, as part of the earned surplus, the unrealized profits included in the unpaid balance of 1917 installment sales contracts at the beginning of each year. In the amended answer these unrealized profits have been excluded from invested capital.

In 1919, Samuel Blum and Philip Blum, were, respectively, petitioner's president and vice president. In addition to their general supervisory duties, Samuel Blum did the buying for all departments of petitioner's business, and Philip Blum had entire charge of the furniture department and supervised all shipping and repossessions. These officers owned all of petitioner's outstanding capital stock. Both devoted their entire time to the business, neither having any interests outside of petitioner's business. Their duties required their presence at petitioner's place of business during all of the business hours; and usually they were there from seven thirty in the morning to six or seven o'clock in the evening, and until nine or ten o'clock on Saturday nights.

During 1917, each of these officers drew a salary at the rate of $6,500 per annum. In 1918, their salaries were increased to $10,400 per annum, each. At a special meeting of the board of directors on January 8, 1919, each was voted a bonus of $10,000 for 1918, and it was understood at the time that their salaries for the year 1919, should be $20,400 each. During 1919, they drew their salaries weekly at the rate of $10,400, but an informal agreement was had with all of the directors that a bonus of $10,000 to each would be authorized at the next meeting of the board to be held in the following year. Accordingly, before petitioner's books of account were closed for the year 1919, the sum of $10,000 was credited to the B & L (borrow and loan) account of each of these officers; and at a special meeting of the board of directors on April 6, 1920, the crediting of the bonuses in the amounts stated to the accounts of Samuel and Philip Blum was held to be justified "because of the increased work and attention of the aforesaid officials," and duly ratified. The Commissioner disallowed the whole of the amounts paid, as bonuses, to these officers as deductions from income for 1919, on the ground that they were not authorized within the taxable year. In their individual income-tax returns for the year 1919 both officers returned

as income the sum of $20,400 as compensation received from the petitioner.

On or about March 15, 1919, the petitioner filed its corporation income and profits-tax return for the calendar year 1918. The Commissioner's deficiency notice, forming the basis of this proceeding, was mailed to the petitioner on January 15, 1925. In this notice the Commissioner made his final determination in respect of the tax of the petitioner for the calendar years 1918, 1919, and 1920, determining an overassessment for 1918 in the amount of $21,429.04 and deficiencies for the calendar years 1919 and 1920 in the amounts of $5,306.23 and $19,318.84, respectively. The petitioner filed its petition within 60 days after the mailing of the Commissioner's notice of his determination, to which petition the Commissioner, within the time allowed by the Board's rules of practice, filed his original answer, specifically admitting and denying the allegations of the petition. Thereafter, on October 16, 1925, the Commissioner, upon motion duly made, offered an amended answer in which he set forth that he had erred in his original determination, notice of which was mailed to the petitioner on January 15, 1925, and that, instead of an overassessment of $21,429.04 for the calendar year 1918, there was a deficiency of $7,143.28 and that the deficiencies for 1919 and 1920 should be increased to $26,380.74 and $46,216.87, respectively, which amended answer was received and filed by the Board on October 16, 1925. A copy of said amended answer was mailed by the Board to counsel for the petitioner by registered mail on October 23, 1925, and was received by counsel for the petitioner on October 24, 1925. Thereafter, the petitioner filed a motion asking that the Commissioner's amended answer be dismissed and subsequently, upon leave granted by the Board, filed a replication denying the allegations of the amended answer. In his amended answer the Commissioner set forth in detail his determination of the deficiencies claimed for the three years and his reasons therefor.

The Commissioner and the petitioner have at no time consented in writing to the assessment of the tax for the calendar year 1918 after the expiration of the five-year period of limitation for the assessment of the tax for that calendar year.

The division hearing this proceeding declined to dismiss the Commissioner's amended answer, whereupon the petitioner filed a replication denying the allegations of the amended answer and the proceeding was submitted upon the oral and documentary evidence and stipulations of certain material facts necessary to a determination of the issues raised in the original and amended pleadings.

OPINION.

LITTLETON: Petitioner moved to dismiss the Commissioner's amended answer on the grounds that it was not really an answer in the case as originally made by the appeal, and had no relation to the deficiencies originally asserted and appealed from; that the amended answer did not meet any issue raised in the petition but amounted in substance to the institution of an entirely new case; that its effect was to assess new deficiencies without giving the petitioner the 60-day notice authorized by the statute and affording it an opportunity to appeal in the regular way; that the Commissioner having determined, in the deficiency notice, an overassessment for 1918, and the five-year period of limitations, in respect of the assessment of a tax for that year, having expired, the Commissioner was without authority on October 16, 1925, to assert a deficiency for that year.

It is unnecessary to enter into a discussion of the question whether the Commissioner, after having determined an overassessment for certain years and deficiencies for certain other years in the 60-day notice mailed to the petitioner, may, thereafter, when the petitioner has filed a petition with the Board for the redetermination of the deficiencies, by affirmative allegations reverse his determination as set forth in the notice mailed to the petitioner showing an overassessment and have the Board instead determine a deficiency, since it appears from the record that the assessment and collection of any tax for the calendar year 1918 was barred by the statute of limitation prior to the date on which he mailed the notice of his determination, to wit, January 15, 1925. The Board will therefore consider the facts relating to the calendar year 1918 only insofar as may be necessary correctly to redetermine the deficiencies for the calendar years 1919 and 1920.

The Commissioner was within his rights in asking that the Board determine greater deficiencies for the calendar years 1919 and 1920 than he had determined in his original deficiency notice. *Hotel de France Co.*, 1 B. T. A. 28; *Rub-No-More Co.*, 1 B. T. A. 228; *Bank of Hartsville*, 1 B. T. A. 920; *Insley Manufacturing Co.*, 1 B. T. A. 1029; section 274 (e) of the Revenue Act of 1926.

Each of the first five assignments of error pertain to some feature of the general proposition of accounting, for income-tax purposes, for income and deductions by the use of the installment sales method. They, with such other related questions as arise from the pleadings, will be considered and disposed of together.

At the outset it should be stated that the Commissioner has not, and does not now, contest the right of this petitioner to return its income from installment sales by the use of the installment sales method as prescribed by article 42 of his Regulations 45. The issues presented are confined solely to a determination of the proper amount of income returnable, and the proper deductions to be made, under the installment sales method. Before undertaking to dispose of the issues here raised, we think it well briefly to review the history of the installment sales method of returning income from the time of its conception in departmental regulations until it finally received legislative sanction by explicit enactment of the Revenue Act of 1926.

The installment sales method of reporting income was first recognized by article 117 of Regulations 33, Revised. These Regulations were promulgated January 2, 1918. On April 17, 1919, the first edition of Regulations 45, containing article 42, was promulgated by the Commissioner with the approval of the Secretary, which, so far as pertinent here, provided as follows:

ART. 42. *Sale of personal property on installment plan.*—Dealers in personal property ordinarily sell either for cash, or on the personal credit of the buyer, or on the installment plan. * * * The rule prescribed is that in the sale or contract for sale of personal property on the installment plan, whether or not title remains in the vendor until the property is fully paid for, the income to be returned by the vendor will be that proportion of each installment payment which the gross profit to be realized when the property is paid for bears to the gross contract price. Such income may be ascertained by taking that proportion of the total payments received in the taxable year from installment sales (*always including payments received in the taxable year on account of sales effected in earlier years as well as those effected in the taxable year*) which the gross profit to be realized on the total installment sales made during the taxable year bears to the gross contract price of all such sales made during the taxable year. * * * If for any reason the vendee defaults in any of his installment payments and the vendor repossesses the property, the entire amount received on installment payments, less the profit already returned, will be income of the vendor for the year in which the property was repossessed, and the property repossessed must be included in the inventory at its original cost to himself, less proper allowance for damage and use, if any. (Italics ours.)

Identically the same language was incorporated in article 42 of the second edition of Regulations 45, promulgated December 29, 1919. On January 28, 1921, Regulations 45 (1920 edition) were promulgated and these contained a material change in the rule laid down in the earlier editions, particularly with respect to including in income a proper proportion of the " payments received in the taxable year on account of sales effected in earlier years." The 1920 edition of Regulations 45 was still in effect when this appeal came on

for hearing; and article 42 thereof, with the new matter in italics, provides as follows:

ART. 42. *Sale of personal property on installment plan.*—Dealers in personal property ordinarily sell either for cash or on the personal credit of the buyer or on the installment plan. * * * The rule prescribed is that in the sale or contract for sale of personal property on the installment plan, * * * the income to be returned by the vendor will be that proportion of each installment payment which the gross profit to be realized when the property is paid for bears to the gross contract price. Such income may be ascertained by taking *as profit* that proportion of the total *cash collections* received in the taxable year from installment sales (*such collections being allocated to the year against the sales of which they apply*), which the *annual* gross profit to be realized on the installment sales made during *each* year bears to the gross contract price of all such sales made during *that respective year. In any case where the gross profit to be realized on a sale or contract for sale of personal property has been reported as income for the year in which the transaction occurred, and a change is made to the installment plan of computing net income, no part of any installment payment received subsequent to the change, representing income previously reported on account of such transaction, should be reported as income for the year in which the installment payment is received; the intent and purpose of this provision is that where the entire profit from installment sales has been included in gross income for the year in which the sale was made, no part of the installment payments received subsequently on account of such previous sales shall again be subject to the tax for the year or years in which received.* * * * If for any reason the vendee defaults in any of his installment payments and the vendor repossesses the property, the entire amount received on installment payments, less the profits already returned, will be income of the vendor for the year in which the property was repossessed, and the property repossessed must be included in the inventory at its original cost to himself, less proper allowance for damage and use, if any. (Italics ours.)

Early in 1925 the *Appeal of B. B. Todd, Inc.*, (reported in 1 B. T. A. 762) came before this Board. In that case the taxpayer appealed from a rejection of its proposed returns upon the installment sales method, insisting that the Board should require the Commissioner to compute its deficiency in tax, if any, by the use of that method. That was the first time we were confronted with the necessity of ruling as to the validity of returning income on the basis prescribed by article 42 of Regulations 45, 1920 edition. We refused to require a redetermination of the deficiency, if any, based upon a net income computed on the installment sales method, holding that such a method was not recognized by statute and could not be adopted. In the course of our opinion we stated as follows:

In dealing with the installment sales basis as laid down by article 42, Regulations 45, we must inquire whether a taxpayer may properly report only the profits realized in cash during a year, while at the same time deducting upon an accrual basis all the cost of goods upon which such profits were realized, and may further deduct accrued expenses of the taxable period for which the reported income is made.

* * * These regulations appeared while the war taxes were at their height, one during the war and the other immediately after its cessation. They provided not only that taxpayers who had previously kept their books and made their returns upon the installment basis might continue to do so, but that taxpayers might change, with the approval of the Commissioner, from the receipts and disbursements or the accrual basis to the installment basis, upon making application so to do.

This opened up a particularly attractive proposal to the taxpayers dealing in property sold on the installment basis. If a taxpayer had been making his returns up to 1916 upon an accrual basis, he had included in gross income subject to tax at low rates all the income received and all the payments anticipated upon sales made to the close of 1916. These anticipated payments in the ordinary course would be made during the years 1917, 1918, and possibly into the year 1919. By changing to the installment basis, such a taxpayer would report none of this income in the years following 1916, and he would report for the year 1918 as gross income only that proportion of the profits accrued in that year which the receipts of the year from contracts entered into during the year bore to the total accruals or accounts receivable set up from contracts made during the year. In other words, while he would deduct the full expenses of 1917, he would report as income only that portion of the profits of the year represented by the percentage of collections to gross sales. In the second year under such a system, the profits of the preceding year realized by collection during the second year would be returned, plus the profits of the second year actually realized by collection. In an installment business, such as pianos, where credits extend over three or four years, this obviously meant that the taxpayer who changed as of January 1, 1917, would not reach, until approximately 1920, the normal level where the profits of prior years coming in would offset the profits of the current year deferred. Even then, if the business was an expanding one, he would always continue to defer the time of reporting taxable income on the expanded basis and would thus possess a continuous advantage over the taxpayer reporting on an accrual basis. But the particularly attractive thing to the installment dealer, in the adoption of these regulations in 1918 and 1919, was the possibility held out to him of deferring the reporting of profits in the high war-tax years until the succeeding years of reduced taxation.

* * * * * * *

* * * To report, however, upon a basis which considers only the profit upon the business entered into during a year which is actually reduced to possession in cash, and to exclude all business of prior years reduced to possession in cash, at the same time deducting as expenses all accrued obligations, is to destroy all relationship between the true net income and the income reported for taxation. This is the effect of the installment basis for the earlier years of its adoption, either by reason of the fact that the taxpayer is newly organized and therefore has no prior business experience or by reason of a change of basis from the accrual method.

* * * * * * *

To be sure, the period of collection of accounts [in an installment business] is probably longer, losses are perhaps slightly higher; but neither of these factors, in view of the results in net profits, appears to the Board to warrant special and favorable treatment of this class of taxpayers at the expense of all other classes of taxpayers reporting income on the cash or the accrual basis.

The gross and unwarranted distortion of income during the transition period, i. e., the period of time before the taxpayer would begin to report its normal level of profits, gave us deep concern in the *Todd* case and was one of the reasons which led us to reject the installment method of returning income.

Our decision in the *Todd* case had been promulgated and published before this proceeding came on for hearing, and there appeared to be grave concern as to the ultimate effect of this decision on installment business if affirmed by the Board in this case. Testimony was taken at great length from two recognized authorities on Federal taxation, which might be divided into two phases—that relating to the advisability of retaining the installment method of returning income, and that relating to the remedies to be applied to overcome the distortion of income during the transition period which admittedly resulted under the method prescribed by article 42 of Regulations 45 (1920 edition). Nothing need be said as to the testimony relating to the advisability of retaining the installment method for returning income; its retention is now a moot question by explicit legislative enactment. Both witnesses testified that, in their opinion, the distortion of income of the transition period, resulting from the application of the rule prescribed in article 42 of Regulations 45 (1920 edition), must be corrected by requiring a taxpayer, returning income through the employment of the installment sales method, to return as income, for any taxable year, all of the profits actually reduced to possession in that year, notwithstanding there may be included profits from installment sales of earlier years which had been returned and taxed as income of those years. It is noteworthy that this remedy appears to have been adopted by the Congress, and certainly has been incorporated in the regulations promulgated by the Commissioner with the approval of the Secretary, under the authority conferred upon him by the Revenue Act of 1926.

Section 212 of the Revenue Act of 1926 contains a new subdivision not theretofore contained in prior revenue acts, and, so far as material here, is as follows:

(d) Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price * * *.

The Act as it passed the House of Representatives and as originally reported to the Senate contained no provision for the retroactive application of section 212 (d). Standing alone, that section was conceivably subject to the construction that its provisions were applicable only in computing income under returns filed under the

Revenue Act of 1926. But Congress, at least the Senate, was made aware of the decision of this Board in the *Todd* case. This is evident from the discussion which took place on the floor of the Senate during consideration of an amendment proposed by its Finance Committee and which was incorporated, as section 1208, in the Act as finally passed. In offering this amendment, Senator Smoot, speaking for the Committee, stated as follows:

Mr. President, this amendment provides that the installment provisions recommended by the Finance Committee, and found on pages 40 and 41 of the bill, shall be given retroactive application. Because of the confusion resulting from the recent installment decision of the Board of Tax Appeals, in the interest of certainty it is deemed advisable to provide that the installment provisions of subdivision (d) of section 212 of this bill shall be applied with retroactive effect.

Under the amendment, past transactions returned in accordance with the Treasury regulations, to the extent that the regulations conform to the provisions of subdivision (d) of section 212 of this bill, can not be reopened, despite the decision of the Board of Tax Appeals. *The Committee intends that the installment provisions of Regulations 45, promulgated on December 29, 1919, will be substantially followed in settling all cases under prior acts under this provision.*

While the committee believes that the *1919* Treasury installment regulations were a proper interpretation of the existing law in determining net income, because of the confusion now existing it is deemed advisable to make the amendment proposed in the interest of certainty. (Italics ours.)

A similar explanation of section 1208 was given in the Report of the Conference Committee, in the following language:

Amendment No. 199: This amendment provides that the installment basis provided in subdivision (d) of section 212 shall be retroactively applied in computing income under the provisions of the revenue acts of 1916, 1917, 1918, 1921, and 1924. *In the application of this provision it is intended that the installment provisions of Regulations 45, promulgated on December 29, 1919, will be substantially followed in settling all cases under prior acts and under this bill;* and the House recedes. (Italics ours.)

Section 1208 of the Revenue Act of 1926 reads as follows:

The provisions of subdivision (d) of section 212 shall be retroactively applied in computing income under the provisions of the Revenue Act of 1916, the Revenue Act of 1917, the Revenue Act of 1918, the Revenue Act of 1921, or the Revenue Act of 1924, or any of such Acts as amended. * * *

Under the authority conferred upon him by the statute, the Commissioner has promulgated his regulations for the proper enforcement of the provisions of subdivision (d) of section 212 of the Revenue Act of 1926, which are embodied in article 42 of Regulations 69, and which, so far as material here, follows:

The rule prescribed is that a person who regularly sells or otherwise disposes of personal property on the installment plan, whether or not title remains in the vendor until the property is fully paid for, may return as income there-

from in any taxable year that proportion of the installment payments actually received in that year which the total or gross profit (that is, sales less cost of goods sold) realized or to be realized when the property is paid for, bears to the total contract price. (See section 212(d).) Thus the income of a dealer in personal property on the installment plan may be ascertained by taking as income that proportion of the total payments·received in the taxable year from installment sales (such payments being allocated to the year against the sales of which they apply), which the total or gross profit realized or to be realized on the total installment sales made during each year bears to the total contract price of all such sales made during that respective year. No payments received in the taxable year shall be excluded in computing the amount of income to be returned on the ground that they were received under a sale the total profit from which was returned as income during a taxable year or years prior to the change by the taxpayer to the installment basis of returning income. Deductible items are not to be allocated to the years in which the profits from the sales of a particular year are to be returned as income, but must be deducted for the taxable year in which the items are paid or incurred or paid or accrued, as provided by section 200 (d).

From this brief review of the history of the installment sales method of returning income, it is manifestly clear that Congress has conferred upon dealers in personal property on the installment plan the privilege of returning income from installment sales upon the method prescribed in section 212 (d) of the Revenue Act of 1926; that such dealers may avail themselves of this right in computing income under the Revenue Act of 1916, and all subsequent revenue acts, and acts amendatory thereof; and that Congress, by implication, at least, has rejected the rule prescribed by article 42 of Regulations 45 (1920 edition) for returning income on the installment method, and has manifested an intent to sanction the rule laid down in article 42 of the second edition of Regulations 45, promulgated December 29, 1919, as a proper interpretation of the statute and as correctly defining the installment sales method of returning income. The rule laid down in Regulations 45, promulgated December 29, 1919, is that a taxpayer employing the installment method of computing income must include a proper proportion of the installment payments received during the taxable year on account of sales effected in earlier years. Note also that the statute does not provide for returning only a proportion of the installment payments received during the year relating to sales made after the change of method, but provides for returning a proportion of " the installment payments *actually received* in that year." To the same effect are the provisions of article 42 of Regulations 69, promulgated by the Commissioner under the Revenue Act of 1926.

Thus, at last we have a remedy for the most glaring ills of the transition period in the requirement that a taxpayer employing the installment sales method of returning income must include a proper proportion of the entire installment payments received during the

year, though some of them may relate to sales the entire profits from which were returned in years prior to the change of method.

There is one other feature of the general proposition of returning income on the installment sales method which must be considered before taking up the issues involved in this particular case. From the very outset the regulations of the Commissioner have held that the amount to be returned as income from installment sales is that proportion of the installment payments which the total or gross profit from installment sales to be realized when payment is completed bears to the total contract price of all such sales. This is also the rule adopted in section 212 (d) of the Revenue Act of 1926. This petitioner, and we have good reasons to believe that the same situation exists in a vast majority of like cases, can not, from its books of account, accurately determine the cost of goods sold for cash separate from the cost of goods sold on the installment plan. The cost of all goods sold was lumped in one account. Consequently, the petitioner is in no position to make an accurate determination of the gross profits from installment sales; and the proportion of the installment payments to be returned as income is not susceptible of accurate ascertainment. This deficiency in accounting records undoubtedly exists in a large majority of installment businesses, rendering it impracticable when they follow the installment sales method for them to make a meticulously exact return of income. This is probably the case with all installment businesses except those buying at manufacturer's list prices less trade discounts and selling at such list prices, or those making all sales at uniform percentages of profit, and they must be rare indeed. A consideration of the entire Revenue Act and particularly the language of subsection (b) of section 212 of the Revenue Act of 1926 leads the Board to believe that it was the intent of Congress in permitting the installment sales method of returning income to authorize the use of a method which would as nearly as practicable clearly reflect income, and if a workable and reasonable rule for computing income by the use of the installment sales method can be found under which taxpayers employing this method will ultimately return all of the profits from installment sales—nothing more or nothing less—we believe such a rule should be followed generally, with such variations from time to time as may seem necessary in order to fulfill the underlying congressional intent.

In this case the petitioner and the Commissioner have resorted to methods for computing the proportion of the installment payments to be returned as income which are the same in principle. They differ only as to the proper figures to be used for the purpose of computation. Their methods accord the same treatment to both cash and installment sales. They involve the determination of a com-

posite percentage rate of gross profit, for each taxable year, upon the basis of the combined cash and installment sales and the aggregate cost of all goods sold; and the gross income returnable is then determined by applying this composite percentage rate to the cash receipts from those sales. Where, as in the case of this petitioner, cash sales are made at a profit considerably less than that to be realized on the installment sales made within the year, it is true that the composite percentage rate of gross profit will be less than the actual percentage of gross profit on installment sales alone; and it might appear, at first hand, that by using this composite percentage rate of gross profit the petitioner would escape taxation on a portion of the profits from installment sales. However, while the petitioner would apply the lower composite percentage rate to the installment payments, at the same time it would apply the same percentage rate to the receipts from cash sales, showing a much greater profit from cash sales than actually realized. The method works out so that the petitioner would return as income, in any taxable year, on account of sales made within that year, an amount in excess of the actual profit on cash sales plus the profits actually realized through collection of installment payments relating to installment sales made in the same year; and such excess will always be the difference between an amount obtained by applying the composite percentage rate to the gross contract price of all installment sales made within the year and that obtained by applying the actual percentage rate of gross profit on installment sales to the same base. The excess reported is taken care of in subsequent years, during which the remaining installment payments will be received, through the application of the same composite percentage rate to the collections made in those years on account of the sales made in the prior year. Under this method the petitioner will ultimately return all of its income—nothing more nor anything less. We believe the suggested method is a reasonable interpretation of the statute in the fulfillment of its underlying purpose, and will clearly reflect income to be returned by the use of the installment sales method. As the Board said in the *Appeal of B. B. Todd, Inc., supra,* " The entire plan of income taxation recognizes the fact that income is a matter, at best, of estimate, and can never be reduced to absolutely definite terms in the case of a large modern business institution."

Turning now to the issues of this case, the first is that the Commissioner has overstated the income returnable for each year on account of installment sales. The petitioner insists that the overstatement results from improper computations of the percentage rates of gross profit, and the application of these erroneous percentage rates to the cash collections. The Commissioner determined

the percentage rate of gross profit, for each year, by dividing the gross profits by the net sales (gross sales less return sales). Petitioner contends that the proper percentage rate can only be obtained by dividing the gross profits by the gross sales without reduction on account of return sales. Taking the figures for 1919, the following illustrates the method of computing the percentage rate contended for by each party:

| | Commissioner's method | Petitioner's method | |
|---|---|---|---|
| (a) Gross sales | $738,913.21 | | $738,913.21 |
| (b) Return sales | 92,937.94 | $92,937.94 | |
| (c) Net sales | 645,975.27 | | |
| (d) Cost of goods sold | 336,122.82 | 836,122.82 | 429,060.76 |
| (e) Gross profit | 309,852.45 | | 309,852.45 |
| Percentage of gross profit: | | | |
| (e) divided by (c) | 47.96 | | |
| (e) divided by (a) | | | 41.93 |

Under the Commissioner's method, 47.96 per cent of the cash payments received in any year, on account of sales made in 1919, must be returned as income, while under the petitioner's method, only 41.93 per cent of such payments should be returned as income.

Much depends for the solution of this problem upon what the figures for return sales represent. It appears from the record that they include (1) the gross contract price of sales mutually canceled within the·year, the parties being restored to *status quo*, and (2) the unpaid balances of the accounts of purchasers who defaulted in their payments, the sale contracts being canceled, the purchasers forfeiting payments previously made, and the petitioner repossessing the merchandise. We shall direct our examination of the problem along two lines, by assuming, first, that the figures are made up entirely of return sales falling within group (1); and, secondly, that they comprise only so-called return sales falling in group (2). Bearing in mind the fact that the income to be returned is to be determined by applying the percentage rate of gross profit to the cash payments actually received, it is readily apparent that, on the basis of the first assumption, the petitioner's method must be wrong, because the total cash payments to be received can not exceed the net sales, and if the petitioner returns as income only 41.93 per cent of the cash payments as they are received it will only return a total profit of 41.93 per cent of $645,975.27, or $270,857.43, whereas the actual profit, for the purpose of the illustration, is $309,852.45. On the other hand, if required to return as income 47.96 per cent (percentage rate under Commissioner's computation) of the cash payments as they are received, the petitioner will return a total profit of 47.96 per cent of $645,975.27, or $309,852.45, the actual profit.

The second assumption presents a more complex problem, because the so-called return sales may represent sales made in the same year in which they were canceled, and sales made in prior years. We will consider the problem first from the viewpoint that the return-sales figures entirely represent sales which were made and canceled in the same year. During the year, the purchasers in default have made their initial payments and perhaps have met some of their deferred payments. The petitioner has retained, under the terms of its sales contracts, the payments made by these purchasers, and may have repossessed the merchandise. Aside from any possible loss occasioned through damage and use of merchandise while in the hands of the purchasers, there is no question that the petitioner is better off to the extent of the total forfeited payments, and that it has realized within the year, income to that extent. These sales are included in the gross sales for the year at the full contract price, but only the unpaid balance of the contract price is charged to return sales. If gross sales are reduced only by the unpaid balance of the contract price, the forfeited payments will be included in net sales and gross profit, which are the two factors for computing the percentage rate of gross profit to be applied against cash collections for determining the income returnable, and the result will be that instead of returning these forfeited payments in full for the year in which they are actually income they will be returned over the several years during which collections on the other sales of the year will continue. Assuming that the forfeited payments for 1919, relating to sales made and canceled in that year, amounted to $10,000, under the Commissioner's method, the petitioner would return as income for that year, 47.96 per cent of that amount, or $4,796, and the balance would be accounted for as and when collections were made on all other sales of that year by applying to such collections a percentage rate greater than the actual percentage of profit on those sales. There are two reasons why gross sales should not be reduced by merely the unpaid balance due on defaulted sales contracts, in the case of sales made and canceled in the same year: (1) It results in spreading the income from the forfeited payments over the years during which collections will be made on all other sales of that year, when in reality the payments are income for the year in which they are forfeited; and (2) the losses sustained and the expenses incurred in the repossession of merchandise constitute deductions for the year of forfeiture and repossession, and should be absorbed as nearly as possible by including the forfeited payments in the income of that year. By reducing the gross sales by the total contract price of sales contracts made and defaulted in the same year, and by including the forfeited payments, in full, in income as a separate item, the net sales would represent the total contract price of all other sales

made during the year, the percentage rate of gross profit would be the actual percentage of gross profit to be realized on the other sales of the year, and the income from the forfeited payments will be returned in the year in which it was actually realized.

Take the other viewpoint of the problem, i. e., that the return-sales figures entirely represent sales made in prior years and are canceled during the current year. By reducing gross sales by any amount on account of the cancellation of those sales, the gross profits from the sales of the current year are reduced below the actual profits, and there is a corresponding reduction in the percentage rate of gross profit which will be applied against the cash collections from sales of the current year, with the result that the petitioner will ultimately return a total profit from sales of the current year less than the actual profit. This is equivalent to the allowance of a deduction for bad debts, on account of the unpaid balances of defaulted sales contracts which have not been reported as income, spread over the years during which collections will be made on sales of the current year.

From the foregoing observations, we conclude that the petitioner's method of computing the percentage rate of gross profit on the basis of gross sales is entirely wrong; and that the Commissioner's method is wrong in the following particulars: (1) In failing to reduce gross sales by the total contract price of sales made and canceled in the same year on account of default in payments; and (2) in reducing gross sales by the unpaid balance of sales contracts of prior years. For the purpose of computing the percentage rate of gross profit in this case, we hold the proper procedure to be as follows:

*In the case of sales made and canceled in the same year on account of default in payments:* Gross sales should be reduced by the total contract price of the canceled sales. All payments made and forfeited by purchasers should be included, in their entirety, in gross income, though not in gross or net sales upon which the percentage of gross profit on all other sales of the year will be computed. In order that the petitioner may have advantage of the deduction, in the year of repossession, of the full amount of the loss sustained, if any, through damage and use of merchandise while in the hands of the purchaser, the difference between the value at which such merchandise was included in the opening inventory, or the cost of the merchandise, according to whether it was on hand at the beginning of the year or was purchased during the year, and its value when repossessed, should be deducted from the cost of goods sold and taken as a separate loss deduction from gross income.

*In the case of sales canceled, on account of default in payments, in a year subsequent to the year or years in which made:* No deduction in the gross sales of the year should be made. All payments made

and forfeited by the purchaser, in the year in which the sale is canceled, should be included, in their entirety, in gross income for that year, though not in gross or net sales upon which the percentage of profit on sales for the year will be computed. Payments made in prior years should not be taken into account in computing gross income for the year in which the sale was canceled. The repossessed merchandise should be included in purchases at cost, less proper allowance for damage and use, if any, or at cost, less any part thereof previously recovered through payments made by the purchasers, in prior years, and not returned as income, whichever is lower. The difference, if any, between the cost, less allowance for damage and use, and cost, less any part thereof previously recovered, should be taken as a loss deduction from gross income of the year of repossession.

The cost of repossessed merchandise should be determined by applying to the contract price (selling price to defaulted purchaser) that percentage rate which is complementary to the percentage rate of profit for the year in which the sale was made.

The percentage of the cash collections which the Commissioner, in the deficiency notice, held to be returnable as income, was determined by deducting the cost of goods sold from net sales and dividing the remainder by the net sales. Using the figures for 1919, the following illustrates the formula:

$$\frac{\text{Net sales } [\$645,975.27] - \text{Cost of goods sold } [\$336,122.82]}{\text{Net sales } [\$645,975.27]} = 47.96 \text{ per cent.}$$

By the same formula, the Commissioner determined the percentage of the cash collections, relating to sales effected in 1918, to be returned as income, as 52.54 per cent. Therefore, the income from sales, for 1919, shown in the deficiency notice, was computed as follows:

| Year of sale | Collections in 1919 | Percentage of profit applicable | Income returnable for 1919 |
|---|---|---|---|
| 1917 | $16,953.34 | | None. |
| 1918 | 129,977.18 | 52.54 | $68,300.50 |
| 1919 | 337,967.16 | 47.96 | 161,556.89 |
| Total | | | 229,857.39 |

Had the Commissioner included in income, in the deficiency notice, a proportion of the cash collections made in 1919, on account of sales effected in 1917, he would have included, according to the above formula, 49.40 per cent of such collections. The income shown in the deficiency notice for each year was computed in the same fashion. The total deductions allowed for 1919 are $208,356.52.

In his amended answer, the Commissioner determines the percentage of cash collections to be returned as income, by deducting from

the net sales the cost of goods sold plus all expenses of the year, except bad debts, collection expenses, and refunds to purchasers, and dividing the remainder by net sales. Using again the figures for 1919, the following illustrates the formula used in his determination as set forth in the amended answer:

$$\frac{\text{Net sales } [\$645,975.27] - (\text{Cost of goods sold } [\$336,122.92] + \text{All expenses of the year, except bad debts, collection expenses, and refunds to purchasers } [\$130,241.12])}{\text{Net sales } [\$645,975.27]} = \frac{27.804}{\text{per cent.}}$$

By the same formula, the Commissioner, in the amended answer, determines the percentages of profit, relating to sales effected in 1917 and 1918, as 25.786 per cent and 29.679 per cent, respectively; and upon the basis of these percentages proposes a redetermination of income from sales for 1919, as follows:

| Year of sale | Collections in 1919 | Percentage of profit applicable | Income returnable for 1919 |
|---|---|---|---|
| 1917 | $16,953.34 | 25.786 | $4,371.59 |
| 1918 | 129,977.18 | 29.679 | 38,575.93 |
| 1919 | 337,967.16 | 27.804 | 93,968.39 |
| Total | | | 136,915.91 |

The total deductions which the Commissioner in the amended answer allows for 1919, amount to $67,122.97, which is the total for bad debts, collection expenses, and refunds to purchasers, for that year. The Commissioner proposes a redetermination of the income from sales, for all of the years in controversy, in accordance with the above procedure. The following shows the results obtained under the two methods:

RESULTS OF METHOD USED IN DEFICIENCY NOTICE

| Year | Income from sales | Other income | Total income | Deductions | Net income |
|---|---|---|---|---|---|
| 1918 [1] | | | | | |
| 1919 | $229,857.39 | $8,964.57 | $238,821.96 | $208,356.42 | $30,465.44 |
| 1920 | 354,027.14 | 12,049.26 | 366,076.40 | 281,657.87 | 84,418.53 |

[1] Deficiency notice shows overassessment; computations not shown.

RESULTS OF METHOD USED IN AMENDED ANSWER

| Year | Income from sales | Other income | Total income | Deductions | Net income |
|---|---|---|---|---|---|
| 1918 | $94,625.51 | $4,875.03 | $99,500.54 | $47,749.71 | $51,750.83 |
| 1919 | 136,915.91 | 9,527.55 | 146,443.46 | 67,122.97 | 79,320.49 |
| 1920 | 212,008.96 | 12,039.46 | 224,048.42 | 77,005.71 | 147,042.71 |

Under the method of computing the percentage of profit and the income as set forth in the amended answer, the expenses of each taxable year are deferred and spread over the accounting periods during which collections on sales effected in that year are made. In other words, the expenses, other than bad debts, collection expenses,

and refunds, of each taxable year are allocated against the income arising out of the sales of that year, to be deducted indirectly by returning as income a lower proportion of the cash collections, only as the income is reduced to possession and returned for the purposes of the tax. The result of this method of computing the percentage of profit and the income for 1919, in the instant case, is that instead of the total deductions of $208,356.42 (reduced by adjustments in amended answer not material here, to $196,312.36) allowed under the method followed in computing the percentage of profit and the income shown in the deficiency notice, the income from sales is reduced by $97,313.07, which with the total deductions for bad debts, collection expenses, and refunds to purchasers, amounting to $67,122.97, is the equivalent of allowing total deductions of $164,436.04, a difference of $31,876.32 against the petitioner. For the year 1920, instead of the total deductions of $281,657.87 (reduced by adjustments in amended answer not material here to $272,932.99) allowed under the method followed in computing the percentage of profit and the income shown in the deficiency notice, the income from sales is reduced $143,064.53, which with the total deductions for bad debts, collection expenses, and refunds to purchasers, amounting to $77,005.71, is the equivalent of allowing total deductions of $220,070.24, a difference of $52,862.75 against the petitioner. Of course, if the method used by the Commissioner in the amended answer should be consistently followed over a period of years, these differences against the petitioner would be adjusted and equalized; but, during the years under consideration, the tax rates were at the highest level, with a substantial reduction in rates for the years in which the differences will be adjusted, so that the adoption of the proposed method works a material disadvantage to the petitioner.

The Commissioner admits that the method used in his determination as set forth in the amended answer has not heretofore been permitted by his regulations; and we note that it is expressly prohibited by article 42 of Regulations 69, promulgated under the Revenue Act of 1926. It seems to us that the computation of the income from installment sales, under the circumstances, in this case, is already difficult and complex enough without injecting some new theory which can only operate to make it more so. Further than that, the statute goes no farther than to prescribe a method by the use of which a dealer in personal property on the installment plan may return income from installment sales. Nothing is contained in the statute which can possibly be construed to deny to this class of taxpayers the deductions provided for under sections 214 and 234, and the petitioner having employed the accrual method of accounting in keeping its books of account, we think it is entitled to deduct all of the expenses, allowances, and losses enumerated in those sections,

which were paid or incurred, or paid or accrued within the taxable years, with the single reservation that it may not deduct as bad debts such portion of its installment accounts receivable not previously returned as income.

As heretofore pointed out, the Commissioner has determined a composite percentage rate of profit for each taxable year to be applied, for the purpose of computing the income returnable, against the cash collections on sales effected in those years, whether the collections be the proceeds of cash sales or installment payments on installment sales. The petitioner, however, contends that since cash sales were usually made at a profit of less than 20 per cent of the selling price, no greater percentage of the proceeds from such sales should be returned as income. If the percentage of profit on cash sales were definitely known, it would be but a matter of simple arithmetic to determine the cost of goods sold for cash and, incidentally, the cost of goods sold on the installment plan. In that event, the actual profit on installment sales and the income therefrom to be returned could be accurately determined, and there would be no necessity for resorting to the method adopted in this case. But where, as in this case, the percentage of profit on cash sales, which certainly was not uniform in respect of all such sales, is not known, no other course appears proper than to treat all sales, cash and installment, on the same basis and to determine a composite percentage of profit on the total sales which will represent the proportion of the cash collections to be returned as income. Further, if the percentage of profit on cash sales is fixed at a lower rate than the composite percentage rate, there must be a corresponding increase in the percentage of profit on installment sales; and any advantage which the petitioner might gain by returning as income a percentage of the proceeds from cash sales less than the composite percentage thereof would be greatly minimized, if not entirely wiped out, by having to return as income a greater proportion of the collections on installment sales. If the petitioner is required to return as income only 20 per cent of the proceeds from cash sales, then it will have to return 54.56 per cent, 49.33 per cent, and 52.78 per cent of the installment payments relating to sales effected in 1918, 1919, and 1920, respectively, as compared with 52.54 per cent, 47.96 per cent, and 51.96 per cent thereof, the composite percentage rates, as determined by the Commissioner in the deficiency notice, with the following results: For 1918, the petitioner would be required to return as income, on account of sales effected in that year, $109,857.92, as compared with $113,562.03, a difference in favor of the petitioner of $3,704.11; but the percentage of profit on installment sales for 1917 would be increased, and as

the total installment payments received in 1918, relating to sales effected in 1917, amounted to $118,188.73, the difference in favor of the petitioner would be practically wiped out; for 1919, the petitioner would return as income, on account of sales effected in 1918 and 1919, $230,662.09, as compared with $229,857.39 in the deficiency notice, a difference against the taxpayer of $804.70, and this difference against the petitioner would be further increased on account of collections relating to sales effected in 1917, amounting to $16,953.34; for 1920, the petitioner would return as income, on account of sales effected in 1918, 1919, and 1920, $356,009.88, as compared with $354,027.14 in the deficiency notice, a difference in favor of the petitioner of $1,982.74, which would be reduced on account of collections relating to sales effected in 1917, amounting to $4,057.81.

Under the circumstances of this case, in which the total cash sales are negligible in comparison with the total installment sales, we are of the opinion that no material distortion of income will result by applying the composite percentage rate to cash collections from cash sales made within the year, in order to determine the income to be returned from that class of sales.

*Second issue.* In 1919 and 1920, petitioner refunded to purchasers on the installment plan certain payments made within those years in the total amounts of $1,942.31 and $3,273.65, respectively. The Commissioner allowed as deductions from gross income of 1919 and 1920 the sums of $930.53 and $1,744.20, which sums are 47.96 per cent and 53.28 per cent, respectively, of the payments refunded in those years. The petitioner contends that the Commissioner should have allowed the entire amounts refunded as deductions from gross income. Obviously the Commissioner's action was proper, since he included in gross income only 47.96 per cent and 53.28 per cent, respectively, of the payments refunded in 1919 and 1920, and the petitioner is not entitled to any greater deduction, on account of the refunding of these payments, than the amounts which have been returned as income. Any difference of opinion in this respect could be readily avoided by excluding the refunded payments from the total installment payments received during these years before computing the proportion of the total payments to be returned as income.

*Third issue.* In 1918, 1919, and 1920, petitioner ascertained to be worthless and charged off as bad debts, installment accounts in the total amounts of $19,205.10, $25,064.71, and $14,419.65, respectively. The amounts thus charged off were the unpaid balances of installment sales contracts of purchasers who had defaulted in their payments, the petitioner failing to repossess the merchandise. The petitioner contends that " although it is in agreement with the Commissioner as to the amount of bad debts actually charged off by it

during the years 1919 and 1920, and as to the method of computing the portion of such bad debts which should be deducted in determining the taxpayer's net income, viz., such part thereof as represents the computed cost of the goods embraced therein, the Commissioner has applied a gross profit percentage in excess of the true percentage as hereinbefore set forth, and thereby arrives at a smaller cost for such goods than would be produced by the use of the correct gross profit percentage as herein contended for." The revenue agent in computing net income for 1919 and 1920 allowed deductions for bad debts in the respective amounts of $12,249.24 and $9,092.72. From the net income as computed by the revenue agent, for 1919 and 1920, the Commissioner allowed further deductions for bad debts, in the amounts of $17,951.90 and $9,261.05, respectively. Thus the total bad debt deductions which the Commissioner has allowed for 1919 and 1920, are $30,201.14 and $18,353.77, respectively, both of which are in excess of the amounts actually ascertained as worthless and charged off by the petitioner in those years. The amount of the deduction which the Commissioner originally allowed for 1918 is not shown by the record.

The total amount of bad debts charged off on the books in 1918, according to the stipulation, related to installment accounts of 1917. Of the total amount charged off in 1919, $9,744.44 related to installment accounts of 1917, $10,623.22 related to installment accounts of 1918, and $4,697.05 related to installment accounts of 1919. Of the total amount charged off in 1920, $3,789.64 related to installment accounts of 1917, $2,991.43 related to installment accounts of 1918, $5,259.56 related to installment accounts of 1919, and $2,379.02 related to installment accounts of 1920. In his determination as set forth in the amended answer, the Commissioner allowed the following deductions for bad debts:

*1918*

| | |
|---|---|
| 74.214 per cent of $19,205.10 (1917 accounts) | $14, 252. 87 |

*1919*

| | |
|---|---|
| 74.214 per cent of $ 9,744.44 (1917 accounts) | $7, 231. 73 |
| 70.321 per cent of $10,623.22 (1918 accounts) | 7, 470. 35 |
| 72.196 per cent of $ 4,697.05 (1919 accounts) | 3, 391. 08 |
| Total bad debt deduction for 1919 | 18, 093. 16 |

*1920*

| | |
|---|---|
| 74.214 per cent of $3,789.64 (1917 accounts) | $2, 812. 44 |
| 70.321 per cent of $2,991.43 (1918 accounts) | 2, 103. 60 |
| 72.196 per cent of $5,259.56 (1919 accounts) | 3, 797. 19 |
| 68.608 per cent of $2,379.02 (1920 accounts) | 1, 632. 20 |
| Total bad debt deduction for 1920 | 10, 345. 43 |

The petitioner raises two objections to the deductions allowed in the amended answer: (1) That so far as they relate to accounts created in 1918, 1919, and 1920, the deductions are predicated upon erroneous percentages; and (2) since the installment accounts created in 1917 were treated as completed transactions of that year, when it was following the strict accrual method of accounting, and returned in full and subjected to the tax for that year, it is entitled to deduct the whole amount of such accounts as were ascertained to be worthless and charged off. The percentages of 74.214, 70.321, 72.196, and 68.608, which the Commissioner applies against the worthless accounts in determining the bad debt deductions in the amended answer, are complementary to the percentages of gross profit for the years 1917, 1918, 1919, and 1920, respectively, as such percentages of gross profit have been computed in the amended answer, and if they were correct their application to the accounts charged off, as the Commissioner has applied them, would reflect the unrecovered cost of the merchandise, and the deductions would be correct. But these percentages are not correct because they are complementary to percentages of gross profit which are incorrect for reasons hereinbefore stated.

The petitioner's contention that there should be deducted from gross income of 1918, 1919, and 1920, as bad debts, the whole of such installment accounts of 1917 which were ascertained to be worthless and charged off in those years, is not well taken. While the fact that the entire profits from the sales represented by those accounts was included in gross income for 1917, in accordance with the method then employed for returning income, presents a situation with a strong appeal, we can not overlook the fact that income taxes are levied upon the gains and profits of annual periods, and that each annual period must necessarily, under the provisions of the taxing statutes, stand by itself. *Appeal of Atkins Lumber Co.*, 1 B. T. A. 317. Any situation which arises, in any taxable year, whether it involve the inclusion of a gain or profit in gross income, or the deductibility of an item of expense or loss, must be considered in relation to the method employed in returning income for that year. The fact that certain accounts receivable of a prior year have been included in the income of that year does not determine the treatment to be accorded them in a subsequent year, after a change in the method of returning income, when they are ascertained to be worthless and uncollectible. The deduction which a taxpayer is entitled to make from the income of any taxable year, on account of debts ascertained to be worthless and charged off within that year, depends entirely upon the method employed in returning income for that year. The rule is that all items of income and expenses and losses must be consistently accounted for on the same basis. *Appeal of Henry Reubel*, 1 B. T. A. 676; *United States v. Mitchell*, 271 U. S. 9;

*Appeal of Owen-Ames-Kimball Co.*, 5 B. T. A. 921. The income of this petitioner, for the years involved, is to be determined by the use of the installment sales method; hence, the deduction which may be made for bad debts must be determined on the same basis. A taxpayer employing the installment sales method returns income only as it is reduced to possession; consequently, the loss resulting from defaulted contracts, if the merchandise is not repossessed, is measured by the unrecovered cost of the merchandise included in the worthless accounts charged off. The Commissioner's method of determining the bad debt deductions, for each of the years in controversy, as set forth in his amended answer, is correct in principle; but the determination of the proper amount of the deductions must await the determination of the percentages of gross profit for 1917 and the years in controversy, in accordance with the procedure indicated by this opinion.

The fourth issue relates to the petitioner's contention that the Commissioner erroneously disallowed as deductions from gross income of the years in controversy, discounts and allowances made to customers, the expense incurred for freight on inbound merchandise, and the cost of alterations to merchandise made on customers' orders. If, during the years in controversy, the petitioner allowed any discounts or made any other allowances to customers, there is no evidence in the record to show that such was the case; nor is there any proof of the Commissioner's alleged action as to discounts and allowances. Lacking any evidence upon which to base a finding of fact, there are no grounds for disturbing the Commissioner's action in that respect. In computing the income shown in the deficiency notice, the Commissioner included freight on inbound merchandise and the cost of alterations to merchandise in the cost of goods sold. These items are also included in the cost of goods sold for each year as shown in the amended answer. The parties have stipulated that the basic figures contained in the amended answer are correct. Therefore, the Commissioner's action as to freight on inbound merchandise and cost of alterations to merchandise is removed from controversy.

The fifth issue relates to the Commissioner's action in disallowing as deductions, losses sustained through damage and use to repossessed merchandise while in possession of defaulted purchasers. In its returns for 1919 and 1920, the petitioner claimed deductions of $10,-106.21 and $15,604.65, respectively, because of losses of this character. The deductions were disallowed by the Commissioner on the ground that due allowance had been made for any losses of the nature stated, and the allowance of these deductions would result in allowing double deductions for such losses. The petitioner denies that the Commissioner has taken these losses into account in computing net income. That the petitioner made repossessions in 1918, 1919, and

1920, and that as a general proposition, the value of the repossessed merchandise, because of damage and use, was less than the original or unrecovered cost, is clear from the evidence; and, under these circumstances, the petitioner sustained losses, in the year of repossession, measured by the difference between the original or unrecovered cost of the merchandise and its value when repossessed. There does not appear to be any dispute as to the extent of the losses of this nature which the petitioner sustained in the years in question; the only matter in controversy is the proper manner of accounting for such losses in computing net income, and we have already decided that in our decision on the first issue.

The sixth issue relates to the Commissioner's action in disallowing, for 1920, a loss deduction of $16,215.36 claimed by the petitioner in its return, on account of shrinkage in value of the merchandise in the closing inventory of that year. This issue was abandoned by the petitioner.

The seventh issue relates to the Commissioner's action in disallowing $20,000, of a total deduction of $40,800 claimed for 1919, for salaries paid to petitioner's executive officers. The Commissioner's action is based on the ground that the additional salaries of $20,000 were not authorized in the year 1919. The facts are fully set out in the findings of fact. The total compensation was paid in equal amounts to Samuel and Philip Blum, who were, respectively, petitioner's president and vice president. The testimony shows that in 1918 each of these officers was paid a fixed salary of $10,400; that on January 9, 1919, they were each voted a bonus of $10,000 for 1918, and that at the same time it was understood that for the year 1919, each would be paid a salary of $20,400; that during the year 1919, they drew their salaries weekly at the rate of $10,400 per annum, but an informal agreement was reached during the year, between all of the directors, that a bonus of $10,000 would be voted to each, for 1919, at the next meeting of the board of directors; that the bonus of $10,000 was credited to the account of each before the books were closed for 1919; and that at a special meeting of the directors on April 6, 1920, the crediting of the bonus to the accounts of these officers and the payment thereof were formally ratified. Following the reasoning adopted in the *Appeal of Reub Isaacs & Co.*, 1 B. T. A. 45, we are of the opinion that the additional salaries of $20,000 were authorized in 1919, and constitute proper deductions for those years. As to this issue, the Commissioner is reversed.

As to the eighth and ninth issues, a determination as to whether the petitioner had a net income or a net loss, in 1919 and 1920, must await a recomputation of the income for those years in accordance with this opinion.

In computing invested capital in the deficiency notice, the Commissioner included, as a part of the earned surplus, the entire profits of installment sales effected in 1917. In the amended answer, the Commissioner eliminated from invested capital of 1918, 1919, and 1920, the profits included in the outstanding 1917 installment accounts receivable, at the beginning of each of those years, as unrealized and not properly includable in earned surplus. The petitioner opposes this action of the Commissioner on the ground that the entire profits on installment sales of 1917 were returned and taxed as income of that year. We think that the action of the Commissioner, as set forth in the amended answer, is correct. For the years in question, the installment sales method has been used in computing income. By the use of that method all of the profits actually reduced to possession in those years, are to be returned as income of those years. The fact that some of these profits have been returned in prior years is to be ignored, and they are, for the purposes of the tax, to be treated as a part of the earnings of the years in which they are reduced to possession. Obviously, the petitioner may not include in invested capital of any taxable year, as earned surplus, the earnings of that year and subsequent years.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, in accordance with Rule 50.*

ARUNDELL not participating.