DELTOX GRASS RUG CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6926.  Promulgated July 29, 1927.

1. Special assessment allowed under section 328, as petitioner acquired a mixture of tangibles and intangibles, the respective values for which can not be determined, and as development costs over a long period of time were charged to expense and the accounting method used precludes the restoration of such costs to invested capital.

2. Where a petitioner, entitled to relief under section 328, introduces uncontroverted evidence showing the average tax of all corporations engaged in the same business, the excess-profits tax should be computed at the rate fixed by the comparatives of record.

3. The March 1, 1913, value of patents determined for depreciation purposes and the average life of several patents determined and used as the period for depreciation purposes.

*John E. Hughes, Esq.,* for the petitioner.
*A. R. Marrs, Esq.,* for the respondent.

This proceeding results from the determination of a deficiency in income and profits tax for the calendar year 1919, amounting to $11,815.42.  Petitioner avers error was committed in that the Commissioner failed (1) to allow a deduction from income in 1919 of a reasonable allowance for depreciation of patents based on the March 1, 1913, value thereof and (2) to compute the excess-profits tax for the year 1919 pursuant to the provisions of section 328 of the Revenue Act of 1918.

#### FINDINGS OF FACT.

The petitioner is a Wisconsin corporation, organized in 1903, with principal office at Oshkosh, and was engaged in the manufacture and sale of grass rugs.  The name of the corporation at organization was the Oshkosh Grass Matting Co. and it was changed, without reorganization, in 1914, to the Deltox Grass Rug Co.

A tough grass, botanically known as *carex stricta,* and colloquially as " wire grass," grows in commercial quantities in the swamp lands of Wisconsin and Minnesota, and has been found possessed of properties rendering it peculiarly suitable for manufacture into twine and weaving into rugs.  The idea of making twine out of it originated with George A. Lowry, who invented a machine for the purpose, and this machine was used by a corporation known first as the Wisconsin Grass Twine Co. and later as the Crex Carpet Co.  An individual, Emil H. Steiger, early realized the value in the swamp lands and he invested in them and engaged in selling wire grass therefrom to the

Wisconsin Grass Twine Co. and later to the American Grass Twine Co., a separate corporation. In 1897 or 1898, Steiger became acquainted with two employees of the Wisconsin Grass Twine Co., by name, L. J. Monahan and Conrad Kieren. It was just about this time that Steiger's business relations with the American Grass Twine Co. became unsatisfactory and he refused to sell the corporation his wire grass lands when it offered him $40 per acre for them. Being discontented, he was in a receptive mood when Monahan and Kieren made a proposition to him to associate with them in the development of an idea they had for making a straight twine out of the wire grass, Steiger to furnish the required capital and in return to have a one-third interest. Steiger thought well of the proposition and at first a corporation was formed, known as the National Grass Matting Co. Steiger bought in his own name, a factory from the Oshkosh Trunk Co. for the use of the corporation, but the corporation did not operate as it was found impossible to raise capital for the project, and about 1898 the corporation dissolved. For a few years following, Steiger, Monahan and Kieren were engaged in developing a machine which would satisfactorily function in the manufacture of the soft straight twine which they believed would be a great improvement over the twine made by others, which had a very rough surface due to the twisting. By the year 1902, Steiger had invested about $35,000 and such progress had been made that the three associates were able to convince capitalists that the improved machine was commercially practicable. In June, 1902, a partnership known as the Oshkosh Grass Matting Co. was formed, of which Steiger, Monahan, and Kieren were members and also three other individuals, Leander Choate, R. C. Brown and F. E. Waite. The partnership operated but there are no details available other than the fact that Marshall Field & Co. purchased their entire output. A little over a year later, by a bill of sale dated August 22, 1903, the partnership conveyed to a corporation formed for the purpose and bearing the same name (Oshkosh Grass Matting Co.), all of its property, consisting of machinery, patent rights, manufactured goods, materials, chattels, moneys, credits, choses in action, etc. Included among these assets were six completed spinning machines, one patent issued December 10, 1901, under the serial number 688,789, for a machine for making twine, and all rights under two applications filed in 1901 and 1902 for patents, one for an automatic feeding machine and the other for an improved machine for making twine. The corporation issued to the partners its entire capital stock, par value $50,000, in payment for the assets, capitalized the patent rights at $25,000, and immediately started operations, which included active prosecution of the applications before the Patent Office. A long period of experimenta-

tion, of construction and reconstruction, and of expensive patent litigation, followed. One of the applications filed was deemed by the Patent Office to interfere with the rights of other inventors and it became necessary to redesign the improved spinning machine. Monahan and Kieren were engaged for years, at the corporation's expense, in redesigning the machine. Finally, a patent, under serial number 785,070, for automatic material-feeding devices, was issued on March 14, 1905, and another under serial number 896,655, for a machine for making twine was issued August 18, 1908.

A competitor sued the Oshkosh Grass Matting Co., alleging infringement, and on this account considerable expense was incurred, over a period of several years, before the rights of the Oshkosh Grass Matting Co. were finally sustained. Following this, Waite severed connections with the enterprise, patented a machine of his own, and, when sued by the Oshkosh Grass Matting Co. for infringement, set up in defense that its patents were invalid, thus occasioning additional expense in defense of the rights. In all, Steiger was compelled to put in a large part of his time and to travel over the country and received his salary and expenses. Attorneys' fees were also incurred, as well as various expenses. Neither this expense nor the cost of the experiments and redesigning or improving, was capitalized. An effort subsequently was made by the vice president and treasurer to segregate the capital items which were expensed in error, but invoices and vouchers are not obtainable and labor pay rolls are not detailed, and it was found impossible to determine the respective amounts. Petitioner has never conveyed an interest in its patents or granted any license thereto. The amount of $25,000 at which the patent rights were entered on petitioner's books, at organization, was entirely written off prior to January 1, 1919, and the petitioner included no amounts in invested capital in 1919, for patents, trade-mark, or good will. The relations and economic effects of the patents are reflected in the following facts: The automatic feeding device (patent No. 785,700) increased the speed of the machine making twine, about 25 per cent. The improved machine for making twine (patent No. 896,655) supplanted in use the earlier model of 1908.

In the acquisition of grass lands from stockholders, real values were disregarded. Steiger sold grass lands to the petitioner, on December 24, 1903, being 602.74 acres, for $15,909.90 par value of capital stock of petitioner, these being the lands for which he had refused an offer of $40 per acre. In 1911, he also sold 433.7 acres to petitioner for $12,600. In 1911, Steiger owned a majority of the capital stock of the corporation. The grass lands were of unusual value to petitioner, for it was necessary for the manufacturers of wire grass, twine, and rugs to acquire large tracts of land suitable for

growing the wire grass, in order to insure a sufficient supply of the raw material. Grass lands finally became so that their ownership was in the hands of a few corporations but this was not achieved, in full, until 1915 or 1916. The president of the Crex Carpet Co. offered $1,000,000 to Steiger, for the petitioner's assets, in 1911, and this offer was refused.

The petitioner's tangible assets and earnings for five years prior to 1913, were as follows:

| Year | Assets | Earnings |
|---|---|---|
| 1908 | $163,040.20 | $45,447.93 |
| 1909 | 207,163.37 | 54,019.70 |
| 1910 | 256,174.42 | 75,852.37 |
| 1911 | 354,332.97 | 105,323.37 |
| 1912 | 458,379.67 | 154,046.70 |

For the period from 1908 to 1912, inclusive, the average of the tangible assets was $287,938.13 and the average of the earnings was $86,938.03.

On March 1, 1913, the petitioner possessed three patents, numbered 688,789, 785,070 and 896,655, respectively, and their aggregate fair market value on that date was at least $350,000. An allowance for exhaustion of these patents, at the rate of $38,500 per annum, is reasonable. On the same date, petitioner owned a valuable trade-mark consisting of the word "Deltox" in a triangle and the whole surrounded by a circle, and had built up an established trade and good will.

In the year 1919, there were, in the United States, three manufacturers, other than the petitioner, engaged in the manufacture and sale of rugs made from *carex stricta*, the same being the Crex Carpet Co., New York, N. Y.; Waite Grass Carpet Co., Oshkosh, Wis.; and Willow Grass Rug Co., Green Bay, Wis. A fourth, the Wisconsin Grass Rug & Carpet Co., Fond du Lac, Wis., was organized but not yet actively in business. These were the only manufacturers engaged in the same business as that in which petitioner was engaged, and their excess-profits taxes for the taxable year 1919 were determined under section 301 of the Revenue Act of 1918, in the amounts, and based on the data as follows:

| | Crex Carpet Co. | Waite Grass Carpet Co. | Willow Grass Rug Co. |
|---|---|---|---|
| Sales | $1,250,327.84 | | $567,165.03 |
| Net income, less $3,000 | 179,133.44 | $131,291.00 | 114,076.79 |
| Excess-profits tax | Nil. | 24,858.32 | 32,286.72 |
| Rate of excess-profits tax _____ per cent_ | Nil. | 18.51 | 27.58 |
| Invested capital | 4,255,519.04 | 504,608.66 | 249,000.00 |
| Patents and good will | 500,000.00 | 25,000.00 | |

For the year 1919, the comparative statistics of the petitioner were as follows: Gross sales, $1,282,361.27; income, $315,764.37 less depreciation of patents, $38,500; net income, $277,264.37; invested capital determined by respondent, $829,627.77; patents and good will, nil; excess-profits tax determined by respondent, $79,246.60; rate of tax, 25.09 per cent.

Petitioner is entitled to have its excess-profits tax for 1919 determined under section 328 of the Revenue Act of 1918, by a computation based upon the three comparatives shown above, namely, Crex Carpet Co., Waite Grass Carpet Co., and Willow Grass Rug Co.

The petitioner filed a waiver dated January 14, 1925, of the time for making any assessment of the amount of income, excess profits, and war profits taxes for the year 1919, until December 31, 1925.

### OPINION.

MILLIKEN: Respondent avers that the patents owned by petitioner on March 1, 1913, had no fair market value on that date, but has introduced no evidence in support of such averment. A consideration of the evidence convinces us that the patents were of great value. On March 1, 1913, the patents owned by petitioner had been sustained by the courts. See *Oshkosh Grass Matting Co.* v. *Waite Grass Carpet Co.*, 194 Fed. 885. By that date the grass-rug industry had passed the experimental stage and had taken its place as one of the great commercial industries. Petitioner, with its patents, was able to enter profitably the field of the manufacture and sale of its product. The utility of the patents had been tested and proven. The uncontroverted testimony establishes the fact that one of the patents increased the speed and output over 25 per cent, for in nine months' time petitioner manufactured what it had theretofore taken twelve months to manufacture, with the resultant savings. An engineer and attorney of qualified experience and ability, placed a minimum value for the several patents on March 1, 1913, of $350,000. Testing the aggregate value of all intangibles as of March 1, 1913, based upon the averages of prior earnings and tangibles and the use of conservative percentage factors, a value is shown largely in excess of the value claimed for the patents. The patents fell short of resulting in a monopoly of the grass-rug industry by petitioner.

Respondent sought to develop the difficulties involved in determining the amount of allowable deduction based on the value of a group of patents where it was impossible to determine the separate values and where their remaining useful periods varied. We have previously held, in such a situation, the deduction is reasonable, if determined on the average life of the several patents. *Union Metal*

*Manufacturing Co.,* 4 B. T. A. 287. Respondent also stressed the fact that petitioner had not claimed depreciation for the patents in original returns filed for 1919. We have passed on this question adversely to his contention. See *Appeal of Union Metal Manufacturing Co., supra.* From the record, we find the group had a March 1, 1913, value of $350,000, and had an average remaining useful life on March 1, 1913, of 9 years, 1 month, yielding an annual deduction at a rate of 11 per cent and amounting to $38,500 per annum.

The second issue concerns the determination of invested capital and the question whether special assessment under sections 327 and 328 of the Revenue Act of 1918 applies. At organization, petitioner acquired a mixture of tangibles and intangibles under circumstances indicating a value attaching to the latter, although it is not possible to satisfactorily determine the amount of value. In the years following organization, lands were deeded to the petitioner for capital stock, by its principal stockholder, without considering the true value of the lands. As a result of a long and difficult period of development costs properly items of capital were charged to expense, by a method of account which now precludes their restoration as capital expenditures. In previous decisions, we have held that the petitioner has a right to a restoration as capital expenditures if the amount thereof is ascertainable. *Appeals of Goodell-Pratt Co., 3* B. T. A. 30, and *American Seating Co.,* 4 B. T. A. 649. It follows that the impossibility of determining the true invested capital of the petitioner brings squarely into application provision (a) of section 327 of the Revenue Act of 1918.

In the deficiency letter, the respondent includes the following paragraph:

You are advised that the Bureau holds your application for assessment under the provisions of Sec. 328 of the Revenue Act of 1918, was properly denied on the ground that a comparison with the concerns as nearly as may be representative in the line of business engaged in by your corporation, does not disclose the exceptional hardship referred to in Sec. 327 of the Revenue Act of 1918.

Petitioner has been able through the industry of its counsel to cause to be of record in this proceeding the data detailed in the findings of fact relative to all of the concerns in the United States engaged in the manufacture and sale of wire grass rugs. At the time of taking of the depositions recording the above facts, and at the hearing of this cause, the respondent was requested to produce data in contradiction to or in support of the evidence adduced, and he failed to respond. From the evidence of record, we are of the opinion that petitioner is entitled to have its tax computed pursuant to the provisions of section 328 of the Revenue Act of 1918. We are further of the opinion that the comparatives of record, namely, Crex

Carpet Co., Waite Grass Carpet Co., and Willow Grass Rug Co., are representative, and should be used in computing the petitioner's tax under section 328.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*