GRAND RAPIDS SHOW CASE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9714, 12770. Promulgated June 30, 1928.

*Julius H. Amberg, Esq.*, and *Frank E. Seidman, C. P. A.*, for the petitioner.

*Alva C. Baird, Esq.*, for the respondent.

1026

1030

**OPINION.**

STEFKIN: The questions involved are:

1. The March 1, 1913, value of patent No. 987,183 or the franchise under which the petitioner used it and was entitled to keep manufacturers out of the field;

2. The reinstatement in invested capital of (a) the amounts spent in acquiring, developing, maintaining and defending the patent, and (b) $85,000 paid to McCrorey which had been charged as expense;

3. The reinstatement in invested capital of $61,288.53 constituting what is alleged to be excessive depreciation charged off in the years 1904 to 1913, inclusive. The petitioner also contends that part of this sum should be reinstated for the purpose of correctly computing the pre-war income;

4. The value of assets acquired in 1910 from the Michigan Barrel Co. in exchange for $100,000 of the petitioner's capital stock. This issue relates both to invested capital and to the amount of depreciation to be taken on such assets during the taxable years in question;

5. Whether the petitioner is entitled to report its income in 1920 and 1921 upon the installment sales basis;

6. Whether the petitioner is entitled to special assessment; and

7. Whether the deficiencies asserted are barred by the statute of limitations.

1. The original petition filed by the taxpayer asserted that patent No. 987,183 had a value on March 1, 1913, of $1,500,000. At the hearing, however, the petitioner amended its petition to increase this amount to $2,500,000. The petitioner asks that that value be used as the basis for computing the exhaustion allowance during all of the years in question—1918 to 1921, inclusive.

The facts have been set out in detail in our findings. Testimony of witnesses at the hearing in support of the value of $2,500,000 was based primarily upon assumptions that on that date the petitioner stood supreme in the field with a device, the worth of which was known and which, it could reasonably be expected, would result in the manufacture and sale of at least 3,000 wardrobes per year over the remaining life of the patent; that after deducting the royalty payable to the inventor, the net profit on each wardrobe would be approximately $50 each, and that it also might be reasonably expected that the Welch Manufacturing Co., a licensee under the patent, would sell 1,500 wardrobes a year over the patent period, which, based upon the license fee, would bring $250,000 over the patent period. It was further assumed that the total figure of two and one-half million dollars thus arrived at need not be discounted because of the practical certainty of income in excess of that estimate. The respondent, on the other hand, contends that such a value to the petitioner, or to anyone else, on March 1, 1913, was entirely beyond all reason, and that financial conditions, the tariff, the world war, legislation and numerous other elements occurring between March 1, 1913, and 1928, the date of the expiration of the patent, could not possibly have been foreseen; that the evidence shows very large amounts spent in advertising and personal solicitation for business; that there was considerable doubt on March 1, 1913, as to the validity of the Smith patent; that it was in litigation by others as it had been by the petitioner prior to 1913; and that the fact that large amounts were spent for defending the patent after 1913 shows at least that the petitioner was not in a supreme position by reason of the ownership of the Smith patent.

The respondent also points out that one of the law suits involving the validity of the patent, the one with the Welch Company, was settled by granting a license agreement to that company to manufacture the wardrobes at $15 each. The respondent argues that because of that fact it must be assumed that there was some doubt as to the validity of the Smith patent, since it is hard to conceive of the petitioner licensing a competitor at $15 a wardrobe when it could have

made $50 a wardrobe by manufacturing them itself. The Himmel company was also litigating the patent rights in question.

The petitioner, explaining its net earnings from 1911 to 1915, maintained that such net earnings would be considerably increased had it not charged off substantial sums as expenses which might properly have been capitalized and included in this capital structure, yet, in computing the value of the patent using Hoskold's theory, or applying a computation based on the license value of the patents, the petitioner does not include the amounts so charged off in the capital structure. The evidence introduced shows that during the years in question the petitioner had average net tangible assets in excess of a million dollars. Yet, during those same years, it earned an average of less than $70,000 a year, or less than 7 per cent upon its net tangible assets. If there should be added to the earnings the amounts of patent costs, advertising costs and traveling expenses charged off as expenses, and those same items are included in the capital structure, we are still unable to find an earning power, as evidenced by the actual earnings two years before and three years after the basic date, which would give a value to intangibles much in excess of $200,000. That the patent had some such value we are satisfied, but in view of all the facts we are inclined to the opinion that the earnings in the subsequent years have undoubtedly influenced the witnesses in their opinions of value as of March 1, 1913, and that any excess over $200,000, in all probability, was not attributable to the patent itself, but to the business ability of the officers in charge of the fortunes of the company, particularly Samuel D. Young, the president, who testified at length at the hearing. His ingenuity, ability and business acumen, in our opinion, were undoubtedly worth more to the petitioner than the Smith patent. In view of all the circumstances, we do not feel justified in placing a greater value upon the patent or the license to use it than $200,000 as of March 1, 1913, and the exhaustion allowance in the years in question should be computed upon that basis.

2. The evidence clearly shows that the petitioner paid $85,000 to McCrorey for his half interest in the Smith patent, payment therefor being completed by 1914. The evidence also shows that this amount was charged to expenses. Similarly the petitioner expended $46,-134.75 in defending and protecting the patent in the years 1910 to 1921 and up to 1918 these amounts were charged off as expense. The total so charged to expense was $40,969.20, and both that amount and the $85,000 paid to McCrorey should be restored to surplus and thus included in the computation of invested capital of the petitioner, since it is clear that they are capital items. See *Gilliam Manufacturing Co.*, 2 B. T. A. 272; *Beaumont Co.*, 3 B. T. A. 822; *Goodell-Pratt Co.*, 3 B. T. A. 30; *Deltox Grass Rug Co.*, 7 B. T. A. 811.

3. The evidence also shows that the buildings of the petitioner had a useful life of about 40 years and that the proper rate of depreciation was 2½ per cent. However, during the years 1904 to 1913 the petitioner had charged off in excess of the proper depreciation rate the sum of $61,288.53. That amount should be restored to surplus and thus included in the computation of invested capital. See *Northwestern Yeast Co.*, 5 B. T. A. 232; *Excelsior Motor Manufacturing & Supply Co.*, 5 B. T. A. 582; and *Box Board & Lining Co.*, 5 B. T. A. 289.

4. Petitioner seeks to prove a value of the assets acquired from the Michigan Barrel Co. in 1910, first, by opinion evidence as to the assets, and second, by opinion evidence as to the value of the stock of the petitioner exchanged for such assets. The book value of the assets as carried by the Michigan Barrel Co. was $193,046.56. The respondent allowed $135,000, basing such value upon the book value of the stock of the petitioner issued for the assets. We are not satisfied with the evidence given either as to the value of the assets or as to the value of the stock, but we do hold that the book value of the stock issued in exchange for the assets was $153,000 and the assets should be included in invested capital in that amount instead of $135,000 as determined by the respondent, since, from all the facts, we are satisfied that the book value of the stock was not more than the actual value. We are not able to say with any certainty that the Commissioner was in error in computing depreciation on buildings and machinery acquired from the barrel company at $70,000, the book value thereof, instead of $125,000, and we therefore approve his action in that respect.

5. Petitioner alleges error on the part of the respondent in holding that it is not entitled to compute income upon the installment sales method, and in restoring to income the amounts deducted by it from gross sales of those years as representing the unrealized profits included in the unpaid installment contracts at the close of those years. Respondent merely denies error, in his answer and brief, without disclosing the reasons for his action. In the deficiency notice, respondent took the position that the amounts deducted from gross sales by the petitioner should be disallowed " for the reason that the provisions of article 23 of Regulations 45 have not been complied with."

That the petitioner, during 1920 and 1921, regularly sold personal property on the installment plan is neither admitted or denied by respondent, though counsel, on one or more occasions during the hearing, expressed some doubt that the transactions referred to were sales on the installment plan. However, the facts established by the evidence should dispel all doubt in that respect. The evidence discloses that the transactions referred to were made on the basis of

an initial payment, generally less than 25 per cent of the contract price, with deferred payments spreading over periods from 6 months to 2 years. Under the terms of the contracts, title to the property remained in the petitioner until the entire purchase price thereof, including any notes given therefor, had been paid. Usually promissory notes for the deferred payments were accepted, but as the makers of these notes are retailers scattered throughout the United States, many of whom have a limited credit rating, they are practically unknown and without financial standing in the markets available to the petitioner for the disposition of such notes. The notes could not be readily disposed of by the petitioner save at a discount so great as to often exceed the estimated profit on the sales; and they could only be discounted at the banks upon the unconditional endorsement of the petitioner. Obligations of this character are without a readily realizable market value, and can not be regarded as the equivalent of cash. They are of little value other than as evidence of the promises of the purchasers to meet the deferred payments under the sales contracts.

The right of a taxpayer who regularly sells or otherwise disposes of personal property on the installment plan to return its income from installment sales in accordance with the installment sales method, as laid down in the statute, is established by the provisions of section 212 (d) of the Revenue Act of 1926, which are to be applied retroactively under section 1208 of the same Act; and this right can not be made dependent upon the employment of certain forms or of a particular method of accounting. If the forms and method of accounting employed contain all the information necessary to a proper computation of income, the petitioner is entitled, if it so elects, to have its income from installment sales computed in accordance with the installment sales method. *L. S. Weeks Co.* v. *Commissioner*, 6 B. T. A. 300; *Appeal of Blum's, Inc.*, 7 B. T. A. 737; *Warren Reilly* v. *Commissioner*, 7 B. T. A. 1327.

The statute does not require that the income shall be computed in any particular manner. It is of primary importance that the method employed clearly reflects income. *Appeal of Blum's, Inc.*, *supra.* In this case petitioner has included in income the gross amount of installment sales, less the unrealized profits included in the unpaid deferred payments at the close of each year, the unrealized profits being determined by applying the proper percentages of gross profit to the outstanding installment contracts at the close of each year. This is precisely the method which we approved with certain modifications in *Warren Reilly* v. *Commissioner*, *supra*, and the income reflected by this method is the same as that obtained by application of the gross profit percentages to the installment payments received during the year.

In *Appeal of Blum's, Inc., supra*, after reviewing the history of the installment sales method of returning income, we held that a taxpayer who changes from the straight accrual method to the installment sales method of returning income must return as income of the year in which the change is made, and of all subsequent years, a proper proportion of all installment payments, actually received in those years, relating to sales effected in years prior to the change in method, notwithstanding that the entire profits from the sales to which such payments relate were, under the method of returning income then employed, returned and taxed as income of the years in which such sales were effected. We stated as follows:

From this brief review of the history of the installment sales method of returning income, it is manifestly clear that Congress has conferred upon dealers in personal property on the installment plan the privilege of returning income from installment sales upon the method prescribed in section 212(d) of the Revenue Act of 1926; that such dealers may avail themselves of this right in computing income under the Revenue Act of 1916 and all subsequent revenue acts, and acts amendatory thereof; and that Congress, by implication, at least, has rejected the rule prescribed by article 42 of Regulations 45 (1920 edition) for returning income on the installment sales method, and has manifested an intent to sanction the rule laid down in article 42 of the second edition of Regulations 45, promulgated December 29, 1919, as a proper interpretation of the statute and as correctly defining the installment sales method of returning income. The rule laid down in Regulations 45, promulgated December 29, 1919, is that a taxpayer employing the installment method of computing income must include a proper proportion of the installment payments received during the taxable year on account of sales effected in earlier years. Note also that the statute does not provide for returning only a proportion of the installment payments received during the year relating to sales made after the change of method, but provides for returning a proportion of " the installment payments actually received in that year." To the same effect are the provisions of article 42 of Regulations 69, promulgated by the Commissioner under the Revenue Act of 1926.

Thus, at last we have a remedy for the most glaring ills of the transition period in the requirement that a taxpayer employing the installment sales method of returning income must include a proper proportion of the entire installment payments received during the year, though some of them may relate to sales the entire profits from which were returned in years prior to the change of method.

On May 29, 1928, the President affixed his signature to the Revenue Act of 1928; and among the provisions thereof which became immediately effective are those contained in section 705, which are as follows:

(a) If any taxpayer by an original return made prior to February 26, 1926, changed the method of reporting his net income for the taxable year 1924 or any prior taxable year to the installment basis, then, if his income for such year is properly to be computed on the installment basis—

(1) No refund or credit of income, war-profits, or excess-profits taxes for the year in respect of which the change is made or any subsequent year shall be

made or allowed, unless the taxpayer has overpaid his taxes for such year, computed by including, in computing income, amounts received during such year on account of sales or other dispositions of property made in any prior year; and

(2) No deficiency shall be determined or found in respect of any such taxes unless the taxpayer has underpaid his taxes for such year, computed by excluding, in computing income, amounts received during such year on account of sales or other dispositions of property made in any year prior to the year in respect of which the change was made.

(b) Nothing in this section shall be construed as in any manner modifying sections 607, 608, 609, or 610 of this Act, relating to the effect of the running of the statute of limitations.

Under the foregoing provisions of the Revenue Act of 1928, if a taxpayer by an original return, filed prior to February 26, 1926, for any year prior to 1925, changed the method of reporting income to the installment sales basis, no deficiency may be determined in respect of such year or any subsequent year, unless the taxpayer has underpaid its taxes for such year, the tax to be computed upon the net income from which there is to be excluded any amounts received during the year on account of sales made in any year prior to that in which the change is made. Thus the provisions of section 212 (d) of the Revenue Act of 1926 and the rule laid down in *Appeal of Blum's, Inc., supra,* which require that a taxpayer changing to the installment basis of reporting income must return as income of the year in which the change is made, and of all subsequent years, a proper proportion of the installment payments received in those years relating to sales effected in years prior to that in which the change was made, have been modified by the provisions of section 705 of the Revenue Act of 1928, so that they no longer apply, provided the change was made for a taxable year prior to 1925 and by an original return filed prior to February 26, 1926.

In the instant case the petitioner made the change to the installment basis of reporting income for the year 1920 by an original return filed on May 14, 1921. Therefore, in computing net income for 1920 on the installment basis, any amounts received in that year on account of sales made in prior years are to be excluded. No installment payments were received in 1921 on account of sales made in any year prior to 1920.

The petitioner's books of account for 1920 and 1921 reflect net sales, cost of goods sold, and gross profits as follows:

|  | 1920 | 1921 |
| --- | --- | --- |
| Net sales | $5,518,566.31 | $3,922,278.13 |
| Cost of goods sold | 3,472,534.14 | 2,003,406.71 |
|  | 2,046,032.17 | 1,918,871.42 |

The above figures indicate that the percentages of gross profits, based upon the total sales, are 37.075 for 1920 and 48.922 for 1921. The evidence is that the same selling prices were charged on all sales whether payable in installments or otherwise; hence, these percentages of gross profit are applicable to the installment sales of the years mentioned.

Section 212 (d) of the Revenue Act of 1926, provides that a taxpayer may return as income from installment sales, in any taxable year, "that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price." Thus the income from installment sales to be returned by this petitioner for 1920 is 37.075 per cent of the installment payments received in that year on account of sales made in 1920, and for 1921 it is 37.075 per cent and 48.922 per cent of the installment payments received in that year on account of sales made in 1920 and 1921, respectively. By applying the proper gross profit percentages to the unpaid deferred payments on installment contracts at the close of each year, it is found that the unrealized profits at the close of 1920 and 1921 are $151,915.96 and $292,923.14, respectively. As the respondent determined the net income for both years on the accrual basis, the net income so determined for 1920 should be reduced by $151,915.96, and that for 1921 should be reduced by $141,007.18.

6. The petitioner contends that its profits taxes should be computed under the special assessment provisions because (a) at the time of its organization in 1904 it acquired, in addition to tangible assets of a predecessor partnership, intangible assets of large value, and the amount of such value can not be determined; (b) in the early years of the petitioner's business various capital expenditures were charged to expense and for that reason it is impossible to determine the petitioner's invested capital; (c) there were abnormal conditions in the method of its organization, because large capital expenditures were charged off, because intangible values in large amounts did not appear on its books of account; because, during 1918 to 1921, it was reaping the fruits of activities of prior years, thus creating an abnormality of income and because there was an abnormality in its prewar credit as the result of unusual conditions existing during those years. It further submits that only two other corporations were properly comparable to it and asks that they be used in computing its profits taxes under sections 327 and 328 of the Revenue Acts of 1918 and 1921.

From all the evidence we are satisfied that the tax should be computed under the special assessment provisions, but we are not satisfied that the evidence submitted as to the proposed comparatives compels a computation using only such comparatives. Since this

▬▬▬▬▬▬▬▬▬▬▬▬

proceeding was heard, the Supreme Court of the United States has decided the case of *Blair* v. *Osterlein Machine Co.*, 275 U. S. 220; 72 L. Ed. 24, and this Board has promulgated its Rule 62 to cover special assessment cases. So far as the special assessment feature is concerned, the taxes should be computed under that rule.

7. The questions raised as to the statute of limitations have been decided adversely to the petitioner in *Stickley Brothers Co.*, 9 B. T. A. 935, and *Pantlind Hotel Co.*, 9 B. T. A. 878. We hold that the deficiencies are not barred.

Reviewed by the Board.

> *Judgment will be entered under Rules 50 and 62(c).*

TRAMMELL and ARUNDELL dissent on the second point.